STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

05-1406

STATE OF LOUISIANA

VERSUS

LARRY SURRATT
AND
CYNTHIA ANDERSON

**********
APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 66,513FA
HONORABLEJOHN LARRY VIDRINE, DISTRICT JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Jimmie C. Peters, Michael G. Sullivan, and Glenn B. Gremillion, Judges.

AFFIRMED WITH INSTRUCTIONS.

C. Brent Coreil
District Attorney  13th JDC
P. O. Drawer 780
Ville Platte, LA 70586-0780
(337) 363-3438
Counsel for Plaintiff/Appellee:
        State of Louisiana

A. Bruce Rozas
P. O. Drawer 280
Mamou, LA 70554-0280
(337) 468-5271
Counsel for Defendant/Appellant:
    Larry Surratt

Marion B. Farmer
P. O. Box 1770
Covington, LA 70434-1770
(985) 893-2560
Counsel for Defendant/Appellant:
    Larry Surratt

Frank Sloan
Louisiana Appellate Project
948 Winona Drive
Mandeville, LA 70471
(985) 845-9492
Counsel for Defendant/Appellant:
    Cynthia Anderson

GREMILLION, Judge.

      In this case, the defendants, Larry Surratt and Cynthia Anderson, were each convicted of two counts of second degree murder, in violation of La.R.S. 14:30.1, and were sentenced to life imprisonment on each count, the sentences to run concurrently. Both Defendants contend that this matter was tried in the wrong venue and that the evidence was insufficient to support their convictions. Surratt also contends that the jury pool was tainted, the State commented on the right to remain silent, and other crimes evidence was improperly admitted. In addition, Anderson contends that the trial court erred in refusing to charge the jury on the law of accessory after the fact. For the following reasons, we affirm the convictions.

## FACTS

      On January 3, 2003, a plastic box containing a dead body was discovered floating in Bayou Cocodrie. Bayou Cocodrie forms the parish line between Evangeline and Rapides Parishes. Although the Rapides Parish Sheriff's Department responded to the scene, it was determined that the box was located in Evangeline Parish. The location of the box was confirmed by Dustin Perkins, the person who discovered the box, Major Herman Walters, Chief Investigator for the Rapides Parish Sheriff's Office, and Keith Dupre and Detective Joseph Demourelle, Investigators with the Evangeline Parish Sheriff's Office. Detective Demourelle was present when the box was opened by authorities, and he testified that the box contained the body of a white male who was later identified as Larry Cook.

1

On January 10, 2003, police searched Bayou Cocodrie in hopes of locating Cook's girlfriend, Sheila Kirby, who was also missing.[1] On that day, a box containing a dead body was discovered on the west bank of Bayou Cocodrie, which was ultimately identified as that of Kirby.

Detective Demourelle testified that it appeared that the lid of the box containing Cook's body had been taped closed and then painted black. Detective Demourelle also observed what he thought were fingerprints in the paint. The box containing Kirby's body was almost identical to the one containing Cook's body. It also appeared to Detective Demourelle that the box containing Kirby's body had been duct taped and then painted.

Dr. Terry Welke performed autopsies on Cook and Kirby. He testified that Kirby was killed by a gunshot wound to the head and Cook was killed by a gunshot wound to the neck. Both bullets exited the victims' bodies and were not found. Dr. Welke said that Cook's legs had been amputated just below the pelvic area; however, his legs were not found in the box containing his body. Kirby's legs had also been amputated, but were found inside the box containing her body. According to Dr. Welke, the legs of the two were amputated postmortem and there were saw marks on the ends of Cook's leg bones.

The investigation led authorities to Defendants. Surratt and Cook were members of the Banshee motorcycle organization. Anderson and Kirby were not members of the organization, as the Banshees do not allow female members.

---

[1] We note that Kirby's name is not consistently spelled in the same manner throughout the trial transcript; therefore, we used the spelling found in the indictment.

Cook and Kirby had lived with Defendants at their home in Lemoine, Louisiana, on two occasions. They moved in with Defendants in August 2000 or 2001, and stayed for a month or two. Cook and Kirby moved back in with Defendants in May 2002. Defendants testified that the two returned because Surratt was concerned about Anderson's safety and Cook and Kirby were living on a riverbank in Texas in a tent and needed a place to stay. Once they moved in, Cook and Kirby were to find work and help out with food.

Defendants asked Cook and Kirby to find another place to live some time in October after Hurricane Lili, but prior to Halloween, because they were not helping out around the house.[2] Anderson testified that the two then moved to a trailer owned by her and located at the Banshee Clubhouse in Lawtell, Louisiana.

Anderson testified that she last saw Kirby on December 4, 2002, at Willie's Camp Ground, a bar located in Washington, Louisiana, and that she last saw Cook at the same location on December 5, 2002. Detective Demourelle testified that Anderson told him she last saw Kirby around Thanksgiving.[3] He also testified that he interviewed someone who said they picked up Cook and Kirby on December 10 or 11, 2002, for a barbeque. However, that person was not sure about the date.

Both Defendants denied any involvement in the murders of Cook and Kirby.

---

[2] Information found at http://www.nhc.noaa.gov/2002lili.shtml. obtained from the National Hurricane Center indicates Hurricane Lili struck the Louisiana coast on October 3, 2002. Detective Demourelle also testified that Hurricane Lili hit Louisiana on approximately October 3, 2002.

[3] The parties entered a stipulation that Thanksgiving was on November 28, 2002.

3

**ERRORS PATENT**

We review all appeals for errors patent on the face of the record in accordance with La.Code Crim.P. art. 920. We find one error patent. The trial court failed to advise Defendants of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is instructed to inform Defendants of the prescriptive period by sending appropriate written notice within ten days of the rendition of this opinion and to file written proof that Defendants received the notice, in the record of the proceedings.

## ISSUES PRESENTED BY BOTH DEFENDANTS

### SUFFICIENCY OF EVIDENCE

In this assignment of error, Surratt contends that the jury committed error when it failed, in this purely circumstantial case, to first eliminate all other reasonable hypotheses of innocence before finding the existence of proof beyond a reasonable doubt. In her assignment of error, Anderson contends that the evidence was insufficient to support the convictions. These assignments will be addressed together inasmuch as they both involve sufficiency of the evidence. Additionally, they will be addressed before all other assignments because a finding that the evidence is insufficient would require an acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992).

Surratt contends there were six reasonable hypotheses of innocence in this matter, which include: 1) that one of the many enemies of the victims conceived, planned, and executed the murders; 2) that he did not have a motive for murdering the victims, as he fed and clothed them and provided them with shelter and transportation; 3) that there were no prior difficulties of any kind shown which would show motive

4

for Defendants to harm to the victims; 4) that the "brotherhood" to which he and Cook belonged entirely precluded them from harming one another; 5) that either the dog found was not the dog of the victims and/or it may have been killed by Cook, rather than by Surratt; and 6) and the existence of the "bloodless" fingerprints on the tape and on the boxes.

Anderson contends that the evidence was merely sufficient to convict her of being an accessory after the fact. She contends that the evidence of her fingerprints on the duct tape does nothing to establish that she participated in shooting the victims and, at most, implicates her only in sealing the boxes containing their bodies at some undetermined time after they were killed.

The test for a sufficiency review is well settled. The supreme court has stated:

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Neal*, 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing *State v. Captville*, 448 So.2d 676, 678 (La.1984)).

> When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Neal*, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under *Jackson* to prove guilt beyond a reasonable doubt to a rational jury. *Id.* (citing *State v. Rosiere*, 488 So.2d 965, 968 (La.1986)).

*State v. Brown*, 03-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.

Defendants were each convicted of two counts of second degree murder. Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1(A)(1). In order to support such a conviction, the State was required to prove beyond a reasonable doubt that Defendants killed Cook and Kirby or had the specific intent to inflict great bodily harm upon each of them.

No eyewitnesses to the victims' murders were presented at trial. Additionally, no crime scene or murder weapon was ever discovered. Accordingly, we must address the physical evidence presented by the State in order to review the correctness of the jury verdict.

The storage boxes that contained the bodies of Cook and Kirby and the duct tape found on those boxes were submitted to the Acadiana Crime Lab. Doug Lancon, who qualified as an expert in forensic science with expertise in firearms identification and latent fingerprint processing, examined the items and determined that there were eleven potentially identifiable fingerprints on the lid of the box that contained Cook's body. The prints were found in paint on the lid. Additionally, Lancon located two latent fingerprints on portions of the duct tape, particularly where two pieces of the tape had been stuck together.[4] While Lancon could not determine when the fingerprints were left on the tape, he was of the opinion that the boxes were taped then painted and the prints left in the wet paint.

---

[4] We note that in brief to this court the State indicates the prints were on tape found on the box containing Kirby's body. Anderson's brief indicates the prints were found on tape used to the seal the box containing the body of Cook. Lancon never specifically referred to the victims by name when indicating on which box the tape containing latent prints would have been, and it is difficult for us to determine which box the tape came from.

Kristen Bayard, who qualified as an expert in fingerprint identification, examined photographs and negatives of the prints Lancon found on the storage box. She entered one of the prints in the AFIS System, which matched Surratt's fingerprints. In all, she matched three prints to Surratt.

Julie Bergen, who also qualified as an expert in fingerprint identification, compared the prints of Surratt to those on the box lid. Two of the prints on the lid were identified as Surratt's left index finger and another was identified as his left ring finger. Bergen also examined photographs and negatives of the prints found on the duct tape. The two prints were determined to be that of Anderson's left middle finger.

The State further qualified Mark Kurowski as an expert in paint comparison. He examined the storage boxes that contained the victims' bodies and Surratt's truck. Upon removing the bed liner from the truck, Kurowski testified that he noticed a two-foot area near the hitch which had been painted blue and that the blue paint had transferred onto the liner. Kurowski also found black paint drops in the area of the truck bed that had not been repainted. There were four major regions of paint drops in the back of the truck. Kurowski testified that if the areas were connected, they formed a rectangle measuring approximately forty-two inches long by twenty-two inches wide, the same measurements as the widest part of the boxes in which the bodies were found. He said that he compared the paint from the top of the storage boxes to the paint found in Surratt's truck. The two samples were "indistinguishable from each other, there's no major differences between the paint from the back of the pickup truck and the paint from the lids, therefore they could have possibly have (sic) common origin, meaning a common can." However, Kurowski testified that there was

no way for him to "make an identification from a can of paint to an item to an exclusion of all other cans of paint because paint is made in such a large batch." Kurowski also found black paint on the chrome bed rail protector. Tests of the paint on the protector revealed that "[i]t was of the same classification and similarities as the other paints from the bed and from the two Rubbermaid boxes." Kurowski opined that the paint would have been from the same lot number and not from a different brand of paint.

The State also presented evidence that Defendants shot Cook and Kirby's dog. Lancon examined a bullet jacket that Officer Dwayne Fontenot removed from the jawbone of a dead dog located approximately a half mile past Defendants' residence.[5] Lancon determined that the bullet was fired from a Browning 9mm the police seized from Surratt at the time of his arrest and from no other gun.

In response to the State's case-in-chief, Defendants presented testimony in an attempt to explain the physical evidence presented by the State.

**The Duct Tape**

Dustin Perkins, who found the box containing Cook's body, testified that the duct tape on that box was half off and that his uncle may have pulled it a little bit before opening the lid of the box. He further testified that the tape was not stuck good and that his uncle did not struggle to get the tape off. However, Perkins did not know if his uncle cut or tore the tape.

Anderson testified that she assisted Cook and Kirby in moving three loads of their belongings to her trailer. She further testified that they used duct tape

---

[5]  Officer Fontenot listed the bullet jacket on his report as a .380 caliber. However, Lancon determined it was actually from a 9mm.

to seal everything and that she handled that duct tape. Anderson stated that she and Surratt, as well as Cook and Kirby, had plastic containers like the boxes the bodies of Cook and Kirby were found in. Surratt was not involved in the move as he was offshore at the time. However, he did testify that he asked a fellow Banshee, Rod LeBlanc, to assist in the move.[6] LeBlanc testified that he placed two boxes that looked like the boxes Cook and Kirby were found in onto a trailer when the two were moving from Defendants' residence. He further testified that the boxes he moved had been taped down and the top had been painted.

***Box Lid***

Surratt testified that it was not uncommon for him to go into one of his sheds and put his hands in paint because Cook painted containers and put them in the shed. He denied that the prints were made when he was cutting a hole in the storage box, and he denied that he cut a hole in the box.[7] Defendants and LeBlanc testified that Cook painted everything because he stole it. Additionally, Anderson testified that Cook painted Defendants' new motorcycle, the lawn mower, and the house. Surratt testified that Cook also painted the garage and cabinets.

Detective Demourelle stated that when he was interviewing Surratt, he mentioned that Surratt's fingerprints had been found on the box containing Cook's body. He testified that Surratt stared at him for a long time, put his head down between his legs, took a deep breath, looked up, and asked for an attorney. Detective Demourelle's report actually indicated that Surratt became upset and asked to go back

---

[6] Rod LeBlanc's name is actually Gerald LeBlanc.

[7] The locations of the holes in relation to the fingerprints appear to be consistent with someone who cut the hole in the box as shown in the photographs in State Exhibit 3 in globo.

to his cell.  On the other hand, Surratt testified that Detective Demourelle told him he was under arrest because his fingerprints were on the container and he sat there and looked at Detective Demourelle and said, "well I guess the best thing I need to do is go back to my cell and get an attorney I reckon, the only thing I need to do."

### Truck Paint

Anderson testified that she started making a memory board for LeBlanc in the summer of 2002.  According to her, the memory board was a board listing all of the names of the deceased members of the Banshees.  She said that she painted the board in the back of the truck and tried to touch up the paint she got on the truck bed.  However, she did not do a good job and had a friend finish it.  Surratt eventually saw the truck, and Anderson testified that he threatened not to let her use it anymore.  Anderson said that the truck was painted a couple of months before Cook and Kirby's deaths.  Surratt testified that Anderson told him she got paint on the back of the truck when painting a memory board and he saw where she tried to touch it up.  He testified that this probably occurred in November and that Cook and Kirby were still alive at that time.  LeBlanc testified that he received a memory board from Anderson in November 2002, and Cook and Kirby were not missing at that time.  As soon as he received the board, he placed it in his living room, and it remained there until he brought it to defense counsel.

### Dog

Both police officers who saw the dead dog testified regarding whether it belonged to Cook and Kirby.  Detective Demourelle testified that Kirby had a dog and that the photograph submitted as State Exhibit 9 was a photograph of Kirby and her

10

dog, a black dog with a white blaze. The photograph was dated August 2001. Detective Demourelle was not absolutely certain that the dog in the picture was the dead dog that was found; however, it was similar, as the dead dog was black with a white blaze. The dog was "pretty well decomposed, was smelling pretty bad" at the time it was found. Officer Fontenot testified that the dead dog was similar to the dog depicted in the photograph, as the dead dog was a black pit bull with white markings and the dog in the photograph was a black pit bull with white markings. Officer Fontenot agreed that if the dog had been killed at the same time as Cook and Kirby it would have been dead for six to seven weeks at the time it was discovered. He testified that the dog had "decomposed but not decomposed to where he didn't have any more hair left."

Both Defendants also testified regarding the dog owned by Cook and Kirby. Anderson testified that the victims' dog was solid black; she did not recall it having white markings. Anderson was shown the photograph submitted as State Exhibit 9. She testified that Cook and Kirby's dog looked bigger than the dog in the photograph. She said that the last time she saw the dog was around Thanksgiving. She further testified that she was taken to see the dead dog, but did not think that it was the victims' dog, as she believed the dead dog had white markings under its neck. After viewing State Exhibit 9, Surratt testified that the dog in the photograph could be the victims' dog; however, he recalled their dog being a lot bigger. Additionally, he could not recall if their dog had any white patches. LeBlanc testified that the dog depicted in State Exhibit 9 looked similar to the dog Cook and Kirby owned.

11

There was also testimony in which Defendants attempted to explain how the dead dog was shot by a gun recovered from Surratt. Surratt testified that he had "shot some dogs," which had been dropped off near his home and got into his trash. He had no recollection of shooting a particular dog. Additionally, he testified that he had not knowingly shot Cook and Kirby's dog. LeBlanc testified that the victims' dog had done a few things to make Cook mad and it would not surprise him if Cook had killed the dog, as he had previously told Kirby that he would "put a bullet in him." Surratt also testified that Cook took his guns one night and drove down their road, shooting them. According to Surratt, he told Cook to stop doing this because he was upsetting the neighbors and making problems for him. LeBlanc testified that Anderson would call him and inform him that Cook was driving through the neighborhood shooting guns in the middle of the night. LeBlanc further stated that the things Cook did scared Anderson. Surratt admitted that Cook bothered Anderson, but testified that he did not scare her.

Anderson also testified that on the day she found out Cook was dead, she returned home from work and found the garage light on, the door cracked open, and every light in the house on. She later noticed that two of the closet doors in her bedroom had been pulled off their hinges. She testified that the 9mm owned by Surratt would have been in the house when the break-in occurred. Anderson also testified that on another occasion she went home and felt someone had been in her home. She testified that she told Officer Craig Ortego, of the St. Landry Parish Sheriff's Office, about the incident in which all the house lights were on. However, Officer Ortego denied being told this.

12

***Opportunity to Kill***

There was also additional testimony presented by the State and Defendants regarding several issues. We note that Surratt attempted to prove that he was working offshore during the time Cook and Kirby were killed. Dr. Welke estimated that the victims were killed on December 22, 2002. He then testified that the exact time of death could not be determined. He stated as follows: "Was it the middle of December, possibly, was it first part of December, that's possible, could have been the end of November, could have been the 30th of November, yes that's possible as well, so as far as the exact time cannot be done." Surratt's work record was introduced and showed that he was off work on November 11, 12, and 13, December 2 through 15, December 24 and 25, December 31, 2002, and January 1, 2003.

Defendants also attempted to prove that they did not have the opportunity to kill Cook and Kirby. As we previously noted, their testimony indicated Kirby was last seen by them on December 4, 2002, and Cook was last seen by them on December 5, 2002. Anderson testified that on December 6, 2002, she and Surratt dropped heaters off at the trailer where Cook and Kirby were living; however, no one was home. Defendants then went to Leesville for a couple of days and returned home for a day or two before going to New Orleans for Anderson's birthday on December 12. According to Anderson, they stayed in New Orleans for three days and then returned home. She said that Surratt went back offshore on December 16 or 17, and was not off again until Christmas Eve and that the two spent the night at LeBlanc's home in New Orleans. LeBlanc confirmed that the two spent Christmas Eve with him. The

testimony also reflected that Surratt was also off on New Year's Eve, but he stayed at his boss' home in New Orleans, without Anderson.

Detective Demourelle testified that Anderson told him that Surratt came home for Thanksgiving, left, and then returned on December 3, 2002. According to Detective Demourelle, Defendants said they saw Cook on December 5, in Washington, Louisiana, then they left for Leesville on December 6, and returned on December 9. He said that on December 10, they said they went to New Orleans and returned on the 14 or 15, when Surratt went back to work. Detective Demourelle further testified that Surratt stated that he was home from work for two days at Thanksgiving and at Christmas and was offshore the rest of the time.

### Drug Enforcement Administration (DEA) Informants

There was also testimony presented regarding materials found at the trailer where Cook and Kirby lived and whether or not the two were DEA informants. Detective Demourelle testified that while in the trailer he found two books marked "DEA Sensitive" and the Anarchist Cookbook. Detective Demourelle testified that the books were located in the kitchen "over the cabinets" in a "two door cabinet up there and they were on the top shelf." He further testified that it appeared the books had been there for quite some time, as they were "[v]ery shabby, very old . . . they looked like they had, possibly the roof had leaked and they were wet and some of the pages, maybe as much as a third of them were gone from I would assume maybe roaches or something eating on them . . . they were in bad shape." The books were sent back to the DEA.

14

Anderson testified that she had never seen the DEA books, and that the books were not in the trailer when Cook and Kirby moved in. She said that only she, Surratt, and the victims had keys to the trailer. Detective Demourelle testified that, after the search of both residences, there were more items found in Defendants' residence than that of the victims that were consistent with the items found in the Anarchist Cookbook.

Anderson testified that the question of whether Cook and Kirby were DEA informants never crossed her mind until State Trooper Gregory Matherne asked her about it. She testified that she believed it was a possibility because Cook would disappear for days and come back with money and different vehicles. Surratt confirmed that Cook would leave home and come back with more "stuff." Anderson did not think that the Banshees would have approved of Cook being a DEA informant. She said that Trooper Matherne spoke to her on another occasion and informed her that he knew for a fact that Cook and Kirby had put nine or ten Banditos in the "pen" for "Meth Labs."[8] However, Trooper Matherne testified that he never told, suggested, or inferred to Anderson that Cook and Kirby were DEA informants.

Kenneth Babineaux, Supervisory Special Agent for the DEA, reviewed the DEA material turned over by the Evangeline Parish Sheriff's Office. He described that material as a notebook containing several pieces of paper that provided law enforcement with intelligence on different motorcycle groups throughout the country. The booklet was very old and falling apart, and some of the pages were torn and turning brown. Once Agent Babineaux realized the material had no value to the DEA,

---

[8] The Banditos are another motorcycle organization.

15

it was shredded and when the information was later requested by either the District Attorney's Office or the Evangeline Parish Sheriff's Office, Agent Babineaux informed them it had been shredded. He also testified that he ran Cook and Kirby's names through the DEA's database and found that neither had ever been DEA informants. However, Agent Babineaux testified that a person who calls the DEA and provides information would not be considered an official DEA informant, although the information provided would be passed on for further investigation.

*Arm Injury*

Surratt suffered an injury to his arm and there was much testimony regarding the date and cause of his injury. Detective Demourelle testified that when Surratt was arrested, he had a bandage on his arm just below the wrist. Surratt testified that he injured his arm when he fell off of the roof and onto his chainsaw while trying to remove a tree that had fallen during Hurricane Lili. Anderson agreed that this "most likely" occurred between November 11 and 13. She testified that Surratt did not seek medical attention at that time, as he does not go to doctors. However, Surratt claimed that he went to a doctor after LeBlanc convinced him to do so because his arm was infected. LeBlanc said that after Christmas, Surratt looked pale and puss was coming from his arm. Detective Demourelle testified that Surratt informed him that he injured his arm on November 2, 2002. Anderson informed him that Surratt was injured around Thanksgiving. She later informed him that Surratt's injury occurred between December 3 and 15, 2002.

Dr. Stephen Nason treated Surratt, and his June 30, 2003 report was admitted into evidence. The report indicates that Surratt told Dr. Nason that he injured

16

his arm in November 2002. X-rays were taken that indicated Surratt suffered a comminuted fracture through the ulna with a gap in between. Additionally, the report indicated that a fragment of metal that appeared to be part of a chainsaw tooth was in his arm.

### *Criminal Record*

Evidence of Cook's criminal record was also admitted at trial. Cook had an extensive criminal record which dated from 1986 to 2001, and included convictions for unlawful carrying of weapons; manufacturing, delivering, selling, and possession of a controlled dangerous substance; possession of marijuana; and possession of amphetamines. At the time of his death, he had pending charges for theft of twenty to fifty thousand dollars, unlawful use of a firearm, and manufacturing and delivering of a controlled dangerous substance. Additionally, LeBlanc testified that the "law" was always after Cook, he had a bad reputation, a lot of people did not like him, he was an amphetamine cook, he had been chased by police, and he had stolen a motorcycle. Anderson testified that Cook was "supposed to be on the run," but she did not know why. Surratt testified that Cook was well known for cooking meth; however, he would ask Cook not to do it in Louisiana. The record also showed that Anderson had a conviction for possession of marijuana in 1980.

### *Banditos*

There was also testimony presented regarding the motorcycle group, the Banditos. Most of this testimony was presented by the State through Trooper Matherne, who was qualified as an expert in outlaw motorcycle gangs. He testified that he worked with the Criminal Intelligence Unit of the Louisiana State Police,

17

whose primary responsibility is the tracking and identification of outlaw motorcycle gangs. Trooper Matherne said that the Banshees are considered an outlaw motorcycle gang. He further testified that, because Cook's tattoos had not been defaced when he was killed, it was a "good possibility" that a member of the Banshees committed the murders. Trooper Matherne said that he contacted the regional and Texas chapter presidents of the Banditos. He stated that the Banditos denied any involvement in the crimes and told him to look within the Banshee organization. According to Trooper Matherne, the Banditos would have told him if they were involved in the crimes.

Anderson testified that Surratt had some disagreements with the Banditos at racetracks in Baton Rouge and Shreveport. Both Defendants described these events in detail, but a discussion of those details is not particularly relevant to the sufficiency of this review.

### Gun Possession by Anderson

The State additionally presented testimony that Anderson was in possession of a .380 caliber gun in Texas. Anderson was stopped by Trooper Ken Caldwell in Texas on April 21, 2003, at which time she possessed a gun. During the stop, Trooper Caldwell informed Anderson that the Evangeline Parish Sheriff's Office had an interest in the gun that she was carrying. He testified that she "stated that the .380 that was located was not the one that was used."

Anderson testified that when she was stopped by Trooper Caldwell she possessed a gun that belonged to a friend, Becky Griffin, which was confirmed by Griffin. Anderson testified that she took the gun because she had moved to Dallas and would drive alone to see Surratt in Louisiana. She further testified that the police told

18

her that they thought Cook and Kirby had been killed with a .380 and she had subsequently gotten the .380 from Griffin; therefore, she told Trooper Caldwell that her gun was not the .380 used to kill the victims.

***Other Evidence Presented by Anderson***

Counsel for Anderson called Burke Foster, who qualified as an expert in criminal investigation, to testify. He reviewed the case file and evidence in this matter. He testified that two or more people of some physical strength were involved in the crime. Additionally, he said that because Defendants had jobs, the possibility that they committed the crimes decreased. Finally, Foster testified that he had not seen anything that explained, to his satisfaction, Defendants' motive for killing Cook and Kirby.

Anderson also called her mother, Vivian Anderson, as a witness. Ms. Anderson testified that Anderson is unable to keep a secret and that she never indicated she was involved in the murders of Cook and Kirby. Pam Ewing, Anderson's employer, testified that Anderson was a very talkative person and, after the murders, her demeanor did not change. Ewing was of the opinion that, if Anderson were involved, she would have let it slip.

*Analysis*

Based on the above evidence, we must determine whether the evidence was sufficient to convict Defendants of second degree murder. The State argues that the forensic evidence implicating Defendants includes: 1) a handgun owned by Surratt, which was used to kill the victims' dog; 2) at least one of the boxes in which the bodies were found had been painted in the back of Surratt's truck; 3) the lid was spray-painted after it had been taped to the box; 4) Surratt's fingerprints were found in the dried paint

on the lid of the box in which Cook's body was found; and 5) Anderson's fingerprints were found on the adhesive side of the duct tape used to secure the lid of one of the boxes. Initially, we would note that the evidence did not conclusively prove that it was the victims' dog that was found dead. Additionally, it was in the jury's province to determine what was painted in Defendants' truck, a box or a memory board, and whether the box lid was spray-painted before or after the lid was taped to the box. Accordingly, the only true forensic evidence presented was the fingerprint evidence.

In *State v. Pryor*, 306 So.2d 675 (La.1975), the defendant was convicted of simple burglary. The state produced no direct evidence of the defendant's commission of the burglary. It relied upon circumstantial evidence, the defendant's fingerprint found on a filing cabinet and the store owner's testimony, that tended to exclude the defendant's authorized entry near the filing cabinet. On appeal, the defendant pointed out that he had once been employed at the store and was a customer of the store. The supreme court discussed fingerprint evidence as follows:

> An authoritative work on the subject summarizes the jurisprudence on this issue. Moenssens, Fingerprints and the Law 118–25 (1969) (Inbau Law Enforcement Series). The work notes, pp. 118–19: 'To support a conviction based solely or primarily on fingerprint evidence, it must be shown that the defendant's fingerprints were found under such circumstances as to exclude any reasonable possibility of consistency with innocence. If fingerprints of the accused are found at the place where a crime has been committed and in such manner as to exclude every reasonable hypothesis save that the fingerprints were impressed at the time that the crime was committed, then a conviction on the sole evidence of such fingerprints may be sustained.' Again, p. 120: 'The finding of a person's fingerprints at crime scenes is not proof of his guilt unless circumstances are such that the fingerprints could only have been impressed there at the time when the crime was committed.'

*Id*. at 677-78. The court went on to conclude that under the circumstances of the case, the fingerprint constituted some evidence from which the jury might have drawn a

20

reasonable inference that the defendant committed simple burglary.  The court noted that, if the jury accepted the evidence presented by the state, it excluded the hypothesis that the print was left at a time other than the crime.  Additionally, it was permissible for the jury to infer that the fingerprint was recent rather than from a time five years earlier when the defendant worked at the store, as graphite powder was used to lift the print.

In *State v. Dukes*, 609 So.2d 1144 (La.App. 2 Cir. 1992), *writs denied, State v. Reed*, 618 So.2d 402 (La.1993), 93-1421 (La. 12/15/95), 664 So.2d 435, the defendant was convicted of the attempted manufacture of methamphetamine. The only evidence presented by the state was one fingerprint found on an acetone can and one fingerprint found on a mason jar.  The court concluded that the evidence was insufficient to sustain the defendant's conviction.  In its analysis, the court cited *Pryor* and *State v. Jackson*, 582 So.2d 915 (La.App. 2 Cir. 1991).  In *Jackson*, the court upheld the defendant's conviction for theft when his fingerprints were found on a drawer which had been removed in order to get to the cash.  The court noted that the defendant had been seen in the area of the crime and the desk was not accessible to the general public, thus, negating the possibility that the defendant's fingerprints had been placed at the crime scene innocently or at some other time.  The court  noted that the case was distinguishable from *Pryor* and *Jackson*, as the defendant's fingerprints were located on an acetone can and a mason jar, items which were not indicative of criminal activity.  Additionally, there was no evidence to preclude the possibility that the defendant's prints were placed on the items at some time prior to the items being used in the charged offense.  The court concluded that it was clear that the state failed to

21

rebut the reasonable hypothesis of innocence that the defendant touched the objects at some time other than during the commission of the offense.

Accordingly, we find that all the evidence, when viewed together and in the light most favorable to the State, supports the jury's verdict. It is clear the jury was convinced that the box was spray-painted in the bed of Surratt's truck and that it was painted after the lid was taped to the box. The jury could have reasonably concluded that Surratt's fingerprints found on the box lid containing the body of Cook and Anderson's fingerprints found on duct tape removed from one of the boxes were placed there by them as they were securing the bodies in the boxes before disposing of them. It is just as clear that the jury rejected Defendants' explanations for the existence of all of that evidence. That finding by the jury is also reasonable based on the totality of the evidence.

> [W]hen a jury rationally rejects the hypothesis of innocence advanced by the defendant, that hypothesis fails, and "the defendant is guilty unless there is another hypothesis which raises a reasonable doubt," i.e., an "alternative hypothesis . . . sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." *State v. Captville*, 448 So.2d at 680 (internal quotation marks and citation omitted).

*State v. Sosa*, 05- 0213, p. 7 (La. 1/19/06), 921 So.2d 94, 99.

> The trier-of-fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact-finder's discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988).

*Id.* at 101.

More importantly, the supreme court has recently spoken to the scope of appellate review in criminal cases where convictions are supported by circumstantial

22

evidence. In *State v. Pigford*, 05-0477, pp. 5-6 (La. 2/22/06), 922 So.2d 517, 520-21, in reversing the second circuit and reinstating the trial court's verdict, the supreme court wrote:

> However, the pertinent question on review was not whether the appellate court found that defendant's hypothesis of innocence offered a reasonable explanation for the evidence at trial but whether jurors acted reasonably in rejecting it as a basis for acquittal. In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676,678 (La. 1984). This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder. *State v. Robertson*, 96-1048, p.1 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La. 1990). A reviewing court may intervene in the trier of fact's decision only to the extent necessary to guarantee due process of law. *State v. Mussall*, 523 So.2d 1305,1310 (La. 1988). Accordingly, in cases relying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of the defendant's guilt beyond a reasonable doubt. *State v. Lee*, 01-1080, p. 12, (La. 11/28/01), 800 So.2d 833,841; *Captville*, 448 So.2d at 678.

"That alternative hypothesis of innocence may have been possible, but it clearly was not so probable that reasonable jurors would necessarily have to entertain a reasonable doubt of defendant's guilt." *Id.* at 521. Accordingly, we find that the jury acted reasonably in rejecting all the reasonable hypotheses of innocence presented by Defendants. Thus, we find that the State proved beyond a reasonable doubt that Defendants committed the second degree murders of Cook and Kirby and affirm their convictions.

## VENUE

In this assignment of error, Defendants contend this case was tried in the wrong parish, that venue was improper in Evangeline Parish and that, therefore, the trial court lacked jurisdiction to try, convict, and sentence them. Both Defendants filed motions to quash alleging that their indictments did not indicate the place of commission of the offenses. After a pretrial hearing, the trial court issued a ruling denying the motions to quash. Defendants then filed separate applications for writ of review. We accepted the matter for full briefing and oral arguments before denying the writs, stating the following:

> It was not established that any element of the offenses took place in Evangeline Parish. Furthermore, Louisiana law does not address the present situation of when it cannot be determined where the crime actually occurred. "Where the law is silent, it is within the inherent authority of the court to fashion a remedy which will promote the orderly and expeditious administration of justice. La.Code Crim.P. art. 17; *State v. Edwards*, 287 So.2d 518 (La.1973)." *State v. Mims*, 329 So.2d 686, 688 (La.1976). The venue articles require the prosecution of the case in the parish where the crime has been committed. If the location cannot be determined, it would serve as an injustice to hold that since the State could not establish the exact geographical location of a murder, an accused cannot be tried. The Louisiana Code of Criminal Procedure does not address the factual circumstances presented by this case. Therefore, this court must fashion a remedy which promotes the administration of justice. The testimony indicates both victims were found in Evangeline Parish. Both victims had been shot and their legs cut off. Other testimony was introduced to establish that the victims lived in St. Landry Parish and the pet of one of the victims was found in St. Landry Parish dead from a gunshot wound. However, the crime scene of the murders has not been located. As noted, Defendants raised objections to venue in Evangeline Parish arguing that the State failed to meet its burden of proving that any of the elements of the crime of first degree murder occurred in that parish. There is no question that the bodies were found in Evangeline Parish. There is also no question that the condition of the bodies, when found, indicate that the deceased did not die from natural causes, but in fact met their deaths in a violent manner.

24

Louisiana Code of Criminal Procedure Article 3 provides that "[w]here no procedure is specifically prescribed by this Code or by statute, the court may proceed in a manner consistent with the spirit of the provisions of this Code and other applicable statutory and constitutional provisions." While La.Code Crim.P. art. 611 provides generally for venue in criminal cases by placing the burden on the State to prove venue by a preponderance of the evidence, it does not provide for the unique situation where the body of a person is found that is apparently the victim of a homicide in a particular parish, yet there is no evidence of where the offense occurred. Louisiana Constitution Article 1, § 16 provides in part that "Every person charged with a crime . . . is entitled to an impartial trial held in the parish where the offense or an element of the offense occurred." An element of first degree murder is the "killing of a human being." La.R.S. 14:30. It is obvious in this case that the condition of the bodies of Mr. Cook and Ms. Kirby, found in Evangeline Parish, indicate that they were killed. The trial court could logically infer that Mr. Cook and Ms. Kirby were killed where their bodies were found. Further, pursuant to the authority of La.Code Crim.P. art. 3, it would serve the orderly administration of justice for this court to adopt the presumption that the killing of Mr. Cook and Ms. Kirby occurred in Evangeline Parish, where their bodies, the condition of which indicate foul play, were found and, therefore, venue is proper in Evangeline Parish. To reason otherwise would allow the absurd result of permitting the suspected perpetrators of the murders to escape trial because they had the mental acuity to conceal the place where any acts of the offense occurred.

*State v. Anderson*, 04-30, pp. 13-15 (La.App. 3 Cir. 7/7/04), 877 So.2d 336, 344-45; *see also State v. Surratt*, 04-57 (La.App. 3 Cir. 7/7/04), 877 So.2d 345.

This court discussed the review, on appeal, of an issue addressed in a pretrial ruling in *State v. Schmidt*, 99-1412, pp. 38-39 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, 152, *writ denied*, 00-2950 (La. 9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205 (2002), as follows:

The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion. *State v. Fontenot*, 550 So.2d 179 (La.1989); *State v. Decuir*, 599 So.2d 358 (La.App. 3rd Cir.1992), *writ denied*, 605 So.2d 1095 (La.1992). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. *See, e.g., State v. Regan*, 601 So.2d 5 (La.App. 3rd Cir.1992), *writ denied*, 610 So.2d 815 (La.1993); *State v. Wright*, 564

So.2d 1269 (La.App. 4th Cir.1989). Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. *State v. Decuir*, *supra*, at 360.

*State v. Hebert*, 97-1742, p. 9 (La.App. 3 Cir. 6/3/98); 716 So.2d 63, 67-68, *writ denied*, 98-1813 (La.11/13/98); 730 So.2d 455*, cert. denied*, 529 U.S. 1072, 120 S.Ct. 1685, 146 L.Ed.2d 492 (2000), *quoting State v. Magee*, 93-643, p. 2 (La.App. 3 Cir. 10/5/94); 643 So.2d 497, 499.

Surratt contends that the evidence presented at trial clearly proves that the victims were killed in St. Landry Parish. Anderson contends that this court, in its ruling on her writ application, disregarded the plain meaning of La.Code Crim.P. art. 611, by finding that it did not provide for the "unique situation where the body of a person is found that is apparently the victim of a homicide in a particular parish, yet there is no evidence of where the offense occurred." She further contends that Article 611 provides for this "unique situation" by denying venue to the parish where the body is found. She claims a prosecution in St. Landry Parish made more sense because a good argument could be made that both the victims and Defendants lived in St. Landry Parish and there was no reason to believe the victims were killed in any other parish. Further, she avers that the situation presented in this case is covered by Article 611 and La.Const. art. 1, § 16 and that this court's prior opinion is in direct conflict with La.Const. art. 1, § 16.

The State contends that nothing has changed since this court's ruling on Defendants' writs, as there was no evidence produced at trial which tended to establish where any element of the offenses took place.

As we noted in our prior opinion in this matter, a crime scene was never located, nor was there any testimony or evidence presented to indicate where Cook and

26

Kirby were killed. Further, we agree with the State that no additional evidence was presented at the trial in this matter that would assist us in making a new or different determination as to where an element of the offenses occurred. Additionally, Article 611 was amended to provide for venue in murder cases where it is unknown where the elements of the offense occurred. Article 611 now provides, in pertinent part, as follows: "If the offender is charged with the crime of first or second degree murder and it cannot be determined where the offense or the elements of the offense occurred, the offense is deemed to have been committed in the parish where the body of the victim was found." The amendment to Article 611 became effective August 15, 2004, a little more than one month after this court's rulings on the Defendants' writs.

Since no additional evidence was produced at trial and because the evidence is clearly insufficient to prove that the offense occurred in St. Landry Parish, we shall defer to our pretrial ruling, noting that it was not patently erroneous and did not produce unjust results. Therefore, this assignment of error has no merit.

## TAINTED JURY POOL AND JURY

In this second assignment of error, Surratt contends the trial court permitted there to exist a security "circus," which resulted in a clearly tainted jury pool and jury. He sets forth several examples of what he thinks constituted a security circus; however, a substantial portion of that information is not contained in the record. Surratt contends as many as nine deputies from three other parishes hovered around a metal detector located within feet of the jury room and courtroom and repeatedly searched people. He further alleges that he was escorted to and from another facility by as many as four police cars. He alleges that defense attorneys were searched four

27

or five times each day, even when having gone to and from the men's room located a few feet away. He further contends that no less than five deputies hovered over him and Anderson in the courtroom. Additionally, no one was allowed to be seated in the courtroom in the first two rows behind Defendants and their attorneys and no less than two deputies guarded the door to the room being used by them for consultation. Surratt alleges that all of these things took place in full view of jurors. We note that most of this information is not found in the trial record, and we shall not rely on that which is not in the record even though Surratt contends that these things suggested to the jury that Defendants were "very, very bad people."

Surratt specifically complains about remarks and/or rumors overheard by four prospective jurors on the second day of jury selection. During voir dire, John Pierrotti, Sr., informed the trial court that there may be a reason he could not serve as a fair and impartial juror and that he did not want to discuss the matter in open court. Pierrotti informed the court, in chambers, that he had heard a rumor the previous day that a shank had been slipped into the facility where Defendant was being held and the shank was "caught." He indicated that one of the persons discussing the issue was another potential juror, Peggy LeBleu. Pierrotti indicated that he was sitting in the hallway of the courthouse by the security guard and "they" were standing by him discussing the matter. Pierrotti asserted that he was present, along with LeBleu, Mrs. Lee, and three other guys. Pierrotti stated this rumor made him feel "this guy is incarcerated and he's still trying to get him a weapon to do something, I mean, he's still planning on hurting somebody, you know." He then indicated "it tends to show that, that if he got his hands on a weapon that he'd probably hurt somebody." Pierrotti

28

informed the court that he would try to put the rumor aside and be "neutral about it." However, he agreed that he would have a preconceived concern that Surratt may be the kind of person that could have already used a shank.

Surratt moved for a mistrial on the grounds that there was an "incalculable and an unfindable [sic] taint of the jury" and that the "rumor being so ramped that it is being talked about by the prospective jurors." The trial court denied the motion and stated that all seated jurors would be questioned. Anderson then joined in the motion and reserved the right to re-urge the motion at a later point.

The trial court then called in the seated jurors individually and questioned them. Janice Deculus informed the court that she heard an officer say that the courthouse was searched around 7:00 the previous day. While waiting for the elevator, Joann Matte heard a guard tell a court employee that he was watching the driveway "because something about a knife was passed to somebody." Matte was not sure whether the people were discussing the case at bar. LeBleu told the trial court that "[t]hey talked about what they had done" and made jokes about Surratt. LeBleu indicated that "a couple of old men" were making jokes. She further stated the following: "there were deputies by Mr. Coreil's office leading into this door and they were all laughing, I don't know exactly who said anything but they were all joking." The record reflects that twenty-four other jurors had not heard any discussion between potential jurors or security personnel or anything that concerned Defendants.

Surratt argues that the trial court was mandated to declare a mistrial from what it knew from the four jurors regardless of what was said by the other jurors and potential jurors. He contends that the trial court had no way to gauge the depth of the

29

taint since it had occurred in a public hallway frequented by all jurors. Additionally,

he argues that this occurred at a stage of the proceedings where there was no reason not

to grant a mistrial and start with a new jury panel. Surratt further contends a mistrial

was mandated under La.Code Crim.P. art. 770, because the comments were made by

bailiffs or deputies, who were court officials. He submits that if we do not agree that

bailiffs or deputies are court officials, a mistrial was warranted under La.Code Crim.P.

art. 775. In support of his argument, Surratt cites *State v. Roman*, 473 So.2d 897

(La.App. 3 Cir. 1985).

A police officer is not considered a court official within the meaning of

La.Code Crim.P. art. 770. *See State v. Anderson*, 02-273 (La.App. 5 Cir. 7/30/02), 824

So.2d 517, *writ denied*, 02-2519 (La. 6/27/03), 847 So.2d 1254; *State v. Scott*, 34,949

(La.App. 2 Cir. 1/25/02), 823 So.2d 960, *writ denied*, 02-1622 (La. 5/16/03), 843 So.2d

1122; and *State v. Love*, 602 So.2d 1014 (La.App. 3 Cir. 1992). Accordingly, we will

address this assignment of error pursuant to Article 775.

> La.C.Cr.P. art. 775 requires a mistrial on motion of the defense
> when "prejudicial conduct inside or outside the courtroom makes it
> impossible for the defendant to receive a fair trial." However, mistrial is
> a drastic remedy that is warranted only when the defendant has suffered
> substantial prejudice such that he cannot receive a fair trial. [*State v.*]
> *Wessinger*, 98-1234 at p. 24 [(La. 5/28/99 )], 736 So.2d [162] at 183;
> *State v. Bates*, 495 So.2d 1262, 1273 (La.1986); *State v. Wingo*, 457
> So.2d 1159, 1166 (La.1984). The determination of whether actual
> prejudice has occurred lies within the sound discretion of the trial judge,
> and this decision will not be overturned on appeal absent an abuse of that
> discretion. *Wessinger*, 98-1234 at p. 24, 736 So.2d at 183; *State v.*
> *Sanders*, 93-[1] pp. 20-21 (La.11/30/94), 648 So.2d 1272, 1288; *State v.*
> *Smith*, 430 So.2d 31, 44 (La.1983).

*State v. Clark*, 02-1463, pp. 31-32 (La. 6/27/03), 851 So.2d 1055, 1079, *cert. denied*,

540 U.S. 1190, 124 S.Ct. 1433 (2004).

In *Roman*, 473 So.2d 897, five jurors read a newspaper article after the jury was selected which set forth the defendant's criminal record. The defendant moved for a mistrial pursuant to Articles 770 and 775. Consistent with Article 771, the judge admonished each juror individually to disregard what he or she had read in the newspaper. On appeal, this court held that the references to the defendant's prior convictions were too prejudicial to be overcome by a mere admonishment and that there was a substantial possibility that the jurors who had this knowledge were unable to be impartial, thereby denying the defendant a fair trial.

In *State v. Daniels*, 32,017 (La.App. 2 Cir. 5/5/99), 740 So.2d 691, *writ denied*, 99-1599 (La. 11/12/99), 749 So.2d 651, after the first day of voir dire, but before the jury was sworn, a prospective juror who had not been questioned informed defense counsel that another prospective juror who had been questioned told her and other prospective jurors that the defendant would not have been charged had he not been guilty and that his mind was made up. The prospective juror who made the remarks admitted that he had done so and the trial court excused the prospective juror on its own motion. The trial court, thereafter, questioned each prospective juror individually. Of the prospective jurors who heard the comment, only one admitted he could not be fair and impartial. The trial court, on its own motion, excused that juror. On appeal, the defendant contended that the trial court erred in failing to grant his motion for mistrial based on the prejudicial comment. Our colleagues on the second circuit noted that the remaining jurors in the matter swore to accept the law as given. The trial court instructed the jurors on the presumption of innocence, the burden of proof necessary to sustain a conviction, and the evidence which could not be

considered in reaching a verdict. The appellate court then found that the trial court did not err in denying the defendant's motion for a mistrial.

The case at bar is clearly distinguishable from *Roman*. The prospective jurors in this matter did not learn about Surratt's criminal record. They merely heard rumors regarding a shank and saw increased security at the court. In that regard, the instant case is similar to *Daniels*. In this case, the trial court questioned potential jurors on the panel at the time the issue arose and was satisfied that the jury venire was not tainted. Out of the twenty-eight people questioned, Surratt points to four of those potential jurors as possibly being tainted, and only one of those, Deculus, actually served on the jury. Surratt has not proven substantial prejudice such that he did not receive a fair trial. Consequently, we cannot say that the trial court abused its vast discretion in denying his motion for mistrial. Accordingly, this assignment of error lacks merit.

## RIGHT TO REMAIN SILENT

Surratt next contends that the State commented on his constitutional right to remain silent and that it commented on Anderson's right when it asked her during cross-examination why she had not told the police the story she was telling the jury. Surratt asserts that both he and Anderson objected in chambers and moved for a mistrial, which was denied. In brief, he states that he "would adopt as his own the argument and law presented on this issue in the scholarly brief filed on behalf of co-defendant, Cynthia Anderson." He further contends that he was prejudiced by the question in the same manner as if the question had been asked of him. We note that Anderson did not raise this issue in brief to this court.

Uniform Rules—Courts of Appeal, Rule 2-12.4 provides, in pertinent part, as follows:

> The argument on a specification or assignment of error in a brief shall include a suitable reference by volume and page to the place in the record which contains the basis for the alleged error. The court may disregard the argument on that error in the event suitable reference to the record is not made.

> All specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed.

As Surratt did not provide a reference to the page number in the record which contains the basis for the alleged error and the issue has not been briefed, we find that this issue has been abandoned. *See State v. Boswell*, 96-801 (La.App. 3 Cir. 2/12/97), 689 So.2d 627.

## OTHER CRIMES EVIDENCE

In this assignment of error, Surratt contends that the trial court erred when it permitted the introduction of testimony regarding other crimes. This issue centers around the item in evidence known as the Anarchist Cookbook. Defense counsel characterized it "as a most horrible publication, so bad that he did not want to sicken the jury by publishing it to them." The book was however offered into evidence by Surratt, but was not published to the jury.

Prior to trial, Surratt filed a Motion in Limine to Exclude Evidence of Other Crimes. Therein, he sought to exclude evidence of a "hand grenade, pipe bomb, stolen truck, stolen guns and/or stolen motorcycle(s)." During trial, the motion was heard and although we can find no ruling in the record, it appears the trial court granted

33

it. In the discussion, we note that Surratt specifically indicated that he did not want any mention of stolen motorcycles or trucks, hand grenades, or pipe bombs to be made.

For its part, the State contends that it never introduced other crimes evidence and questioned Detective Demourelle about the Anarchist Cookbook only to further establish that it was unclear who owned the book. On direct examination, the State questioned him regarding books that were found in the trailer where the victims lived at the time of their deaths. In his response, Detective Demourelle mentioned the Anarchist Cookbook. The State asked him several times his opinion as to whether he felt the book, along with the other books marked DEA Sensitive, belonged to the Defendants or to the victims. Counsel for Surratt objected to the questioning, and the trial court sustained the objection

On cross-examination, Detective Demourelle testified that he had the Anarchist Cookbook in his office. The trial court issued an instanta subpoena for the book, and it was presented to the trial court. The trial court summarized the arguments regarding the book as follows:

> As I appreciate the situation in Detective Joe Demourelle's testimony he found certain items in the residence that was resided in by the victims, specifically, the DEA Sensitive Books and another manuscript captioned the Anarchist . . . Cookbook. [Defendant Surratt's attorney] wishes to enter into evidence and I am inclined to agree. On the other hand, [the State's attorney] has indicated that if this is entered into evidence he feels that the State should be allowed to introduce the items that were found in the residence of the defendants which coincide with many of the itemized booby traps or weapons that are contained in the Anarchist Cookbook. [Defendant Surratt's attorney] objects to the introduction of same because it would be the introduction of other crimes evidenced. It is the Ruling of the Court that I will allow the introduction of the Anarchist Cookbook but I will not allow evidence of other crime[s].

Under questioning by the State, Detective Demourelle said that he had the opportunity to search both the residence of the Defendants, as well as that of the

victims. When asked whether more items were found in the residence of the Defendants or the victims that were consistent with the items in that book, Detective Demourelle responded, "More items at the residence of Mr. Surratt and Ms. Anderson."

At that point in the trial, Surratt moved to have a bench conference in chambers and, subsequently, for a mistrial because Detective Demourelle indirectly referred to other crimes evidence. The motion was denied by the trial court.

Initially, we would find that the ruling regarding Surratt's Motion in Limine did not cover the Anarchist Cookbook, as he specifically limited what other crimes evidence he was referring to. Additionally, the Anarchist Cookbook was first mentioned during the testimony of Detective Demourelle and after the court's ruling regarding other crimes evidence. Furthermore, it was counsel for Surratt who requested that Detective Demourelle retrieve the book, brought up certain topics that were contained in the book, and had the book admitted into evidence.

Surratt contends that the State desired to point out to the jury the presence of illegal items in the Defendants' home in order to prejudice him. However, he fails to point out any illegal items in the Anarchist Cookbook. Additionally, the State did not mention any specific items in the book when questioning Detective Demourelle. Furthermore, the Anarchist Cookbook was never published to the jury. Considering the entirety of the evidence and arguments involving this assignment, we find that it lacks merit.

### ISSUES PRESENTED BY ANDERSON

### FAILURE TO GIVE A JURY CHARGE

In this assignment of error, Anderson contends that the trial court erred in refusing to charge the jury on the law of accessory after the fact. She argues that the

35

jury could have easily inferred from the evidence that she was an accessory after the fact rather than a principal to the crime of second degree murder.

On the other hand, the State contends it presented no evidence that Anderson was an accessory after the fact and she maintained she knew nothing about the murders. Additionally, the State claims that she never asserted she assisted only in moving or disposing of the bodies.

During a conference, counsel for Anderson requested that the definition of accessory after the fact be included in the jury instructions. The trial court denied the request, indicating that accessory after the fact was not a responsive verdict to second degree murder.

> Under La.Code Crim. Proc. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is adequately covered by the general charge or in another special charge to be given. *State v. Segers*, 355 So.2d 238, 244 (La.1978), *rehearing granted on other grounds*, 357 So.2d 1 (La.1978). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. *State v. Marse*, 365 So.2d 1319, 1323 (La.1978); *see also* La.Code Crim. Proc. art. 921.

*State v. Tate*, 01-1658, p. 20 (La. 5/20/03), 851 So.2d 921, 937, *cert. denied*, 541 U.S. 905, 124 S.Ct. 1604 (2004).

In *State v. Dotson*, 04-1414 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, the defendant was convicted of first degree robbery. On appeal, the defendant alleged that the trial court erred in failing to give a jury charge regarding "the lesser offense of accessory after the fact." *Id.* at 316. This court noted that the defendant had not been charged with accessory after the fact and that accessory after the fact was not a responsive verdict to armed robbery pursuant to La.Code Crim.P. art. 814(A)(22).

36

Accordingly, this court held there was no error in the trial court's refusal to provide the jury with the requested instruction. *See also State v. Womack-Grey*, 99-416 (La.App. 4 Cir. 2/6/02), 809 So.2d 1166, *writ denied*, 02-0695 (La. 11/22/02), 829 So.2d 1035; *State v. Fish*, 00-922 (La.App. 5 Cir. 1/30/01), 782 So.2d 1087, *writ denied*, 01-0548 (La. 2/1/02), 808 So.2d 337.

In the case at bar, Anderson was not charged with accessory after the fact, and accessory after the fact is not a responsive verdict to second degree murder. *See* La.Code Crim.P. art. 814(A)(3). Additionally, Anderson denied any knowledge of the murders during her testimony. Thus, according to *Dotson*, the trial court did not err in refusing to give the requested instruction. Further, the failure to give the requested charge did not cause a miscarriage of justice or prejudice any of the substantial rights of Anderson, nor was there a substantial violation of any constitutional or statutory right. Accordingly, this assignment lacks merit.

## CONCLUSION

Defendants' convictions are affirmed. However, the trial court is instructed to inform Defendants of the prescriptive period for filing post-conviction relief by sending appropriate written notice within ten days of the rendition of this opinion and to file written proof that Defendants received the notice in the record of the proceedings.

**AFFIRMED WITH INSTRUCTIONS**.