STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 06-1372


STATE OF LOUISIANA

VERSUS

JUSTIN CHARLES SINGLETON


**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 03-K0963D
HONORABLE DONALD WAYNE HEBERT, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and James T. Genovese, Judges.


**CONVICTION AFFIRMED; REMANDED WITH INSTRUCTIONS.**


**G. Paul Marx**
**Louisiana Appellate Project**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 237-2537**
**Counsel for Defendant/Appellant:**
**Justin Charles Singleton**

**Earl B. Taylor**
**District Attorney, 27th Judicial District Court**
**Alisa Ardoin Gothreaux**
**Assistant District Attorney, 27th Judicial District Court**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1968**
**(337) 948-3041**
**Counsel for State of Louisiana:**

**EZELL, Judge.**

Although originally indicted for first degree murder, a jury ultimately convicted Defendant, Justin Charles Singleton, of second degree murder, in violation of La.R.S. 14:30.1, on December 17, 2004.

On January 28, 2005, Defendant moved for a new trial in open court based on unfair prejudice caused by the erroneous admission of evidence obtained through an illegal search. Defendant later filed a supplemental motion for new trial with allegations that the prosecution had created unfair prejudice by withholding exculpatory evidence. The trial court conducted a hearing on Defendant's motions for new trial on April 29, 2005. After considering the evidence and argument presented at the hearing, the district court denied the first motion for new trial but granted the supplemental motion for new trial. At that time, the State objected to the ruling and reserved the right to seek supervisory review. The State timely filed an application seeking supervisory review with this court.

After reviewing the State's writ application, this court granted relief, holding:

> **WRIT GRANTED AND MADE PEREMPTORY:** The trial court abused its discretion in granting Respondent's motion for new trial. Respondent bore the burden of proving that the evidence was newly discovered, that the defense exercised due diligence in discovering the evidence, that the evidence was material to the issues at trial, and that the outcome of the trial probably would have been different if the evidence had been introduced. La.Code Crim.P. art. 851(3); *State v. Watts*, 00-602(La. 1/14/03), 835 So.2d 441; *State v. Knapper*, 555 So.2d 1335 (La.1990); *State v. Prudholm*, 446 So.2d 729 (La.1984).
>
> In the instant case, the new evidence was not material to Respondent's conviction as the evidence did not undermine confidence in the outcome of the trial by creating reasonable doubt where none existed before. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1985); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); *State v. Jacobs*, 99-991 (La. 5/15/01), 803 So.2d 933; *State v. Talbot*, 408 So.2d 861 (La.1980). Additionally, the introduction of the evidence at trial probably would not have altered the verdict, because the evidence did not exculpate Respondent.

1

Accordingly, the district court's judgment granting Respondent's motion for new trial is hereby reversed, vacated, and set aside. Respondent's conviction for second degree murder is hereby reinstated and the case is remanded for sentencing.

*State v. Singleton*, an unpublished opinion bearing docket number 05-922 (La.App. 11/2/05), *writ denied*, 05-2485 (La. 3/24/06), 925 So.2d 1225.

On May 26, 2006, the trial court sentenced Defendant to life imprisonment in accordance with La.R.S. 14:30.1. Defendant now appeals and asserts four assignments of error.

## STATEMENT OF FACTS

Kersey LeJeune and his wife owned and operated Lejeune's Grocery on Highway 190 near Opelousas. They kept the money, an assortment of ones, fives, and tens, in a drawer tray behind the counter. Mrs. LeJeune napped in the apartment adjoining the store until around 5:00 p.m. on Tuesday, March 4, 2003, Mardi Gras Day. Mrs. LeJeune woke up and saw a young man walking toward her through the bathroom that connected the store to the apartment. The man said something, and Mrs. LeJeune went into the store where she saw a young woman, Aimee Bollich.

Mrs. LeJeune looked around, but she did not see her husband. After observing the expressions on the faces of the young man and woman, she began to suspect that something had happened to Mr. LeJeune. Ms. Bollich tried to prevent Mrs. LeJeune from going behind the counter, but Mrs. LeJeune was able to slip away. Mrs. LeJeune made her way to the counter and saw her husband lying on the floor before Ms. Bollich was able to pull her away.

Byron St. Andre lives on a street located immediately off Highway 190 near Opelousas. Mr. St. Andre's home is near LeJeune's Grocery, but he cannot see the store from his house unless it is wintertime when there are no leaves. Mr. St. Andre was at home on March 4, 2003. Before lunch, Mr. St. Andre noticed an older model

2

yellowish-cream Caprice Classic turning around in his driveway; it went across the railroad tracks and remained there for fifteen or twenty minutes. There were two black men in the car, with the driver appearing to sit higher in his seat than the passenger. From where the car parked, the occupants could see the entrance of LeJeune's Grocery.

Jason Anderson, who is Defendant's distant cousin, was studying criminal justice at Grambling in 2003. Mr. Anderson came home from college several days prior to Mardi Gras and went to the house shared by Defendant, Joseph Guillory, and Mr. Anderson's younger brother Jean. Mr. Anderson's brother lived there at the time, but he was staying in Alexandria. Defendant's mother, grandmother, and aunt all live across the street. Mr. Anderson spent Monday night at the house; he saw and spoke to Defendant and Guillory while he was still there Tuesday morning. When Mr. Anderson left before 10:00 that morning, Defendant and Guillory were still at home. Defendant and Guillory usually traveled in a Chevrolet Caprice that Guillory had bought approximately three months prior to Mardi Gras. When Mr. Anderson was at the house on Cherry Road, the license plate was on the car.

Mr. Anderson's mother, Mary Agnes Guillory Dominick, is also both Defendant's and Guillory's cousin, although she feels more like an aunt to them. On March 4, 2003, Mrs. Dominick drove away from Opelousas toward Eunice, going west on Highway 190. Between 4:30 p.m. and 5:00 p.m., Mrs. Dominick noticed Defendant and Guillory walking along the roadside with a gas can. Mrs. Dominick picked them up and drove them to Guillory's car, which was parked on the opposite side of the road and pointed east toward Opelousas. Once they started the car, Mrs. Dominick continued her trip to Eunice. Guillory's car was yellow and looked like the car pictured in the State's photographs. Mrs. Dominick did not remember whether

3

the car had a license plate on the back of the vehicle, but she did recall that there was a permanent license plate "kind of laying over" in the rear window of the car. After visiting with her grandmother for about an hour-and-a-half, Mrs. Dominick returned to Opelousas. As she passed LeJeune's Grocery, she noticed an unusually large number of vehicles parked outside the store.

John Pierrotti was a frequent customer at the store; he would stop in daily on his way to or from work. Mr. Pierrotti, who was friendly with the LeJeunes, worked until 5:00 p.m. that day. On his way home, Mr. Pierrotti stopped at LeJeune's Grocery to purchase potatoes. Mr. Pierrotti noticed that there was a pale yellow Caprice in the parking lot.

Mr. Pierrotti paused for a moment outside his truck and noticed a black male, between five-and-a-half to six feet tall, walking rapidly from the front of the store to the yellow car. The man was wearing a dark and light colored jacket and a doo-rag on his head. Mr. Pierrotti did not notice anyone else near the car. The man climbed into the driver's side, revved the engine twice, spun out, made a U-turn, and headed east. As the car left, Mr. Pierrotti noticed that there was a second black man in the vehicle. Mr. Pierrotti observed that the car had no license plate and no lock for the trunk. The license plate and trunk were in the condition pictured by the State's photograph.

Feeling suspicious, Mr. Pierrotti entered the store. No one greeted him as he entered, which was unusual. Mr. Pierrotti called out, but no one answered. As he approached the counter, he noticed that the mats on top were out of place. When Mr. Pierrotti looked over the counter, he saw Mr. LeJeune sitting on the floor in blood. Staying where he was, Mr. Pierrotti asked if Mr. LeJeune was alright. When he did not get a response, he went to get his cellular phone from his truck. Mr. Pierrotti

4

dialed 911. Before anyone answered his call, he saw a patrol car driving west toward Eunice; he signaled for assistance. The police officer took the car's description and radioed the information.

While Mr. Pierrotti was talking to the officer, a man and wife arrived at the store. The young lady indicated that she was a nurse and went into the store, accompanied by her husband. Later that evening, Mr. Pierrotti identified a vehicle stopped at a Chevron station in Church Point as the car he saw at the store. Mr. Pierrotti saw Mrs. LeJeune exit the store and leave with the nurse and her husband.

Keelin Leger lives on a road half of a mile from Highway 190. Mr. Leger left his house on the afternoon of March 4, 2003, to walk to LeJeune's Grocery. As he approached the store, Mr. Leger noticed an older model yellow Caprice leaving the parking lot and going east on Highway 190. The vehicle depicted in the State's photographs appeared to be the same one he saw leaving the parking lot. Mr. Leger went into the store, but he was asked to leave by a woman and man standing behind the counter.

Dr. Cameron Snyder, a forensic pathologist with the Lafayette Parish Coroner and Forensic Facility, testified for the State as an expert in the field of medicine with a specialty in forensic pathology. Dr. Snyder performed an autopsy on Mr. LeJeune's body. During the examination, Dr. Snyder determined that Mr. LeJeune had been seventy-four inches tall. Dr. Snyder observed two gunshot wounds to the back right side of Mr. LeJeune's head, one behind the ear and one seven centimeters below on the neck. There was no gunshot residue or stippling around the wounds, which indicated that the gun was a minimum distance of two or three feet from Mr. LeJeune when it was fired. Because of the type of injury, the shots were fired in rapid succession.

From the position of the body, the location of the bullet in the wall, the fact that the gun would be extended an arm-length away from the shooter, and the dimensions of the area, Dr. Synder testified that it is unlikely that the shots were fired from behind the counter. The gun would have necessarily have been about five feet seven inches from the ground when it was fired.

Ms. Bollich is a registered nurse with a bachelor's degree. On March 4, 2003, Ms. Bollich, whom was living with her grandmother in Eunice, traveled with Jared Monceaux, who she later married, to visit her father in Swords. On the way, they stopped at LeJeune's Grocery. Ms. Bollich had been in LeJeune's Grocery many times and had been on friendly terms with Mr. and Mrs. LeJeune. When she arrived at the store, Ms. Bollich noticed a deputy and another man outside of the store. Ms. Bollich entered the store and went to the counter where she saw that someone was hurt. Mr. LeJeune was lying unconscious against the corner; he had been shot and was bleeding. There was a large pool of blood.

Ms. Bollich testified that she went over the counter to help because Mr. LeJeune would not have been able to breathe in the position she found him. Mr. Monceaux helped her position Mr. LeJeune with his legs flat on the ground, so she could perform CPR. Mr. LeJeune had no airway, so she tried to perform some chest compressions. Mr. LeJeune was still alive when she reached him, but his heart stopped beating; he expired about five minutes after she went behind the counter. The police photographed Mr. LeJeune in the position she left him. The police took her shoes. Mr. Monceaux had been dating Ms. Bollich in March of 2003. Mr. Monceaux had never before been to LeJeune's Grocery, but he stopped there with Ms. Bollich to buy groceries for her father. When they arrived at the store, they spoke to a man outside. As a result of that conversation, Mr. Monceaux and Ms.

6

Bollich entered the store. They found Mr. LeJeune slouched over in a corner on the floor. There was blood on Mr. LeJeune's face and on the floor. The police also took Mr. Monceaux's shoes.

Wiley Mauldin, who is a dispatcher for the Church Point Police Department, began work at 5:00 p.m. on March 4, 2006. Officer Mauldin received a call from the Opelousas Police Department, and as a result, radioed information to the on-duty officers. At around 5:15 p.m., Officer Mauldin transmitted details about two black males in an older model yellow Chevrolet Caprice who would be arriving in Church Point on Highway 35 north. Patrolman Tim Valair radioed in regarding the vehicle around 5:20 p.m. Patrolman Valair then notified Officer Mauldin that he had stopped the vehicle at 5:36 p.m. In response, Officer Mauldin dispatched Officers Mark Venable and Jared Lafosse to assist.

As Patrolman Valair was getting off duty at 5:00 p.m. on March 4, 2003, he received a BOLO, be on the lookout for, two black males in an old model Chevy vehicle that had been involved in an armed robbery. Patrolman Valair drove to an area where he could observe traffic coming from the area of the armed robbery. After a while, Patrolman Valair noticed a dirty beige or tan older Chevrolet occupied by two black males. Patrolman Valair followed the vehicle into the Church Point city limits. Once in Church Point, the vehicle stopped at a Chevron station. Patrolman Valair did not approach the car; instead, he radioed in and waited for backup.

Patrolman Valair had noted that the license plate was in the back window, which was not the correct place. Patrolman Valair watched the passenger of the car attempt to reattach the license plate to its proper location while he waited for assistance. When backup arrived, Patrolman Valair approached the driver while the other officers contacted the passenger. Patrolman Valair identified Defendant as the

7

driver of the car, noting that Defendant had been wearing braids in his hair and a doo-rag, which Defendant later removed.

Sergeant Lafosse assisted Patrolman Valair in detaining the two armed robbery suspects. When they arrived at the Chevron station, Sergeant Lafosse noticed the vehicle parked at a gas pump and a black male exiting the store and going toward the rear of the car. The man did not have on a hat of any kind; however, the man behind the wheel had on either a stocking or knit hat. Sergeant Lafosse first assisted in contacting the man at the rear of the vehicle before going to the driver's side of the car. Officer Venable placed the license plate on the front passenger seat. Officer Venable had also taken money from the man at the rear of the vehicle and placed it on the front passenger seat. Sergeant Lafosse discovered the gun, which was partially revealed, because the center armrest was not completely closed; however, he left it where it was and did not touch it.

Officer Venable responded to a call for assistance at the Chevron station in Church Point; Sergeant Lafosse accompanied him on the call. As he neared the Chevron station, Officer Venable observed the Chevy Caprice parked at the gas pumps. Officer Venable saw a black male at the rear of the car attaching a license plate. Another black male was seated behind the steering wheel of the car. Officer Venable approached the man standing at the rear of the vehicle. Officer Venable did not search the passenger; instead, he patted him down for safety purposes. Officer Venable took a large wad of money, a cigarette lighter, and a license plate from the passenger and put these items on the front passenger seat of the car. Although Officer Venable also saw the handgun in the armrest, he did not touch it.

Detective Craig Ortego, from the St. Landry Parish Sheriff's Office, helped investigate Mr. LeJeune's shooting. Detective Ortego videotaped the crime scene.

8

Investigators discovered a .380 Colt semi-automatic handgun in the center armrest of Guillory's car. The car's license plate was discovered in the front passenger side seat. Investigators discovered a license plate registered to Guillory's father in the trunk. Investigators also found $68.00 in the car: two tens, four fives, and twenty-eight ones. Defendant only had $9.46 on him at the time of his arrest.

Defendant is six feet three inches tall, and Guillory is five feet ten inches tall. Investigators obtained a doo-rag from Defendant and a pair of Air Jordan sneakers from Guillory. Guillory's sneakers had a spot of blood on the toe of the left shoe that tested positive as belonging to Mr. LeJeune. Guillory's shoes also matched footprints at the crime scene. The bullet fragment removed from Mr. LeJeune's head and the bullet removed from the pegboard in the store were fired from the handgun found in Guillory's car. Additionally, the unfired bullet found in the parking lot had also been ejected from the pistol.

### ERRORS PATENT/ASSIGNMENT OF ERROR NUMBER FOUR

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there is one error patent which is raised as an assignment of error.

The court minutes indicate the trial court provided Defendant with written notification of the prescriptive period for filing an application for post-conviction relief; however, there is no written notification in the record, and the sentencing transcript does not indicate that Defendant was given written notice of the time limit for seeking post-conviction relief. Thus, this court will instruct the trial court to inform Defendant of the La.Code Crim.P. art. 930.8 time delays by sending written notice thereof to Defendant within thirty days of the rendition of this opinion.

9

Additionally, this court will require the district court to file written proof that Defendant received the notice in the record.

**ASSIGNMENT OF ERROR NUMBER THREE**

Defendant complains that:

> The verdict is based on insufficient evidence because there was no proof of Justin having been involved in the robbery, and the State at best could only show he was with Guillory, who shot the victim and robbed him, after the crime, but offered no direct evidence that Justin knew of or was concerned as a principal in the robbery.

Defendant additionally alleges that the State failed to introduce any evidence showing a plan or agreement by Defendant, that there were no witnesses to the actual crime, that the verdict is called into doubt because his co-defendant was the only one with a DNA link to the crime scene, that the circumstantial evidence presented by the State was inadequate for a conviction because it did not exclude every reasonable hypothesis of innocence, and that, even though he was charged as a principal, the State failed to prove specific intent to kill.

The State responds that the evidence was sufficient to support Defendant's conviction and that it successfully proved its theory that both Defendant and Guillory participated in the crime.

> The test for a sufficiency review is well settled. The supreme court has stated:
>
> > When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Neal*, 00-0674, (La.6/29/01)[,] 796 So.2d 649, 657 (citing *State v. Captville*, 448 So.2d 676, 678 (La.1984)).

10

> When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Neal*, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under *Jackson* to prove guilt beyond a reasonable doubt to a rational jury. *Id.* (citing *State v. Rosiere*, 488 So.2d 965, 968 (La.1986)).

*State v. Surratt*, 05-1406, p. 5 (La.App. 3 Cir. 6/7/06), 932 So.2d 736, 740 (*quoting State v. Brown*, 03-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18)(alteration in original).

Under La.R.S. 14:30.1, second degree murder, in pertinent part, is the killing of a human being while the offender is engaged in the perpetration of an armed robbery. The evidence most favorable to the prosecution shows that Defendant, the taller of the two, drove Guillory in Guillory's car to "case" LeJeune's Grocery in preparation for robbing it later in the day. Both Defendant and Guillory participated in the armed robbery; and during the robbery, one of them intentionally killed Mr. LeJeune by firing two gunshots into his head. Officers identified Defendant as the driver of the car, who was the last of the two young men to leave the store, so Guillory was already in the car. Again, as the driver of the car, Defendant was responsible for revving the engine and spinning the tires as well as the hurried exit. If Defendant had been an innocent party leaving the store after discovering Guillory's crime, he would likely have been more interested in getting help for Mr. LeJeune, who was still alive and in getting away from Guillory, than in assisting Guillory in fleeing the crime scene.

This court has previously stated that, if the State proves a defendant participated in an armed robbery and someone was killed during the offense, it has sufficiently proven that the defendant was a principal to the offense of second degree murder. *State v. Cooper*, 03-161 (La.App. 3 Cir. 12/23/03), 862 So.2d 512, *writ*

11

*denied*, 04-236 (La. 6/4/04), 876 So.2d 74. Accordingly, we find that this assignment of error is without merit.

### ASSIGNMENT OF ERROR NUMBER ONE

Defendant argues that "[t]he trial court denied Justin Singleton a fair trial because the court denied peremptory challenges in violation of [*Batson*] without a primae [sic] facie showing of discriminatory intent and then released a juror after commencement of trial without just cause."[1] Defendant contends that, under *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769 (1995), the trial court erred in placing the burden of proof on the proponent of the strike, Defendant, when it should have placed the burden of proof on the opponent, the State. Defendant asserts that the district court erred in acting *sua sponte* when it should have waited for the State's motion under *State v. Elie*, 05-1569 (La. 7/10/06), 936 So.2d 791. Defendant further claims that the trial court erred in requiring Defendant to give further explanation after he had clearly established race neutral reasons for the first two peremptory challenges.

The State responds that Defendant's *Batson* allegations are without merit and that the trial court acted well within its broad discretion. The State points out that abuse of discretion is the proper standard for reviewing a district court's rejection of a race neutral factual basis. The State observes that *Batson* has been codified in Louisiana under La.Code Crim.P. art. 795. As stated in *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348 (1992), and *State v. Knox*, 609 So.2d 803 (La.1992), *Batson* extends to actions by defendants as well as the State. The prosecution comtends that it met the initial criteria for a *prima facie* demonstration of prejudice. The State contends that, under *State v. Collier*, 553 So.2d 815 (La.1989), Defendant must give

---

[1]*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986).

12

a race neutral explanation that is clear, reasonably specific, legitimate, and related to the particular case being tried, but the trial court may reject Defendant's race neutral reasons because they are not based in fact.

Court convened for jury selection on December 13, 2004. After interviewing the first panel of prospective jurors, the trial court granted four joint challenges for cause and then considered peremptory challenges. The defense exercised four peremptory challenges, all on white jurors, before the State raised its *Batson* objection: Ms. Julie Bergeron, Mr. Marshall Dupre, Ms. Vickie Smith, and Mr. Joseph Chapman.

The State began its *Batson* challenge by stating, "*Batson*:"

> MR. RICHARD:    Batson.

> THE COURT:    Okay, let's talk about Batson. I'll listen to you Mr. Richard.

> MR. RICHARD:    Well, we had--the defense has challenged--the first person who was of the white race was Ms. Bergeron because Mr. Moreau was first. He's white. He was excused by the Court. Mr. Thomas is black. He was accepted by the State and the defendant. Ms. Bergeron is a white female. She was excused by the defense. Mr. Collins is a black male; the Court excused him. Mr. Lazarre, the State excused him and I would articulate for the record my reason for excuse. He's a twenty-four year old male who is at home, doesn't have a job, hasn't done anything, just sits around playing basketball. I don't want that kind of--somebody who doesn't do anything is not going to serve on a jury that I think, of this nature. The Court excused Ms. Gardiner, who is a black female. Mr. Lazarre is a black male. Mr. Marshall Dupre is a white male who was excused by the defendant. Ms. Potier, who is a white female, was excused by the Court. Ms. Smith is a black female and accepted by the State and by the defense. That's Ms. Tomeka Smith. Ms. Vickie Smith is a white female excused by the defense. That's the third white person and the third white person to come up. In other words[,] there are five people that have not been excused by the State. One person by the State and the rest by the Court. And the first three are white that they get to and they've excused them, and the same thing is true of Joseph Chapman; he's a white male and they have excused him.

> THE COURT:    Mr. Goorley, let's begin with Ms. Bergeron. Do you have articulable reasons?

MR. GOORLEY:  May I first state that we haven't even gotten to the end of the first group of jurors and I believe that that motion is a little premature.

THE COURT:  I want you to articulate the reasons for the peremptory challenges exercised thus far as to each.

MR. GOORLEY:  Ms. Bergeron, I excused her because[,] even though she said it would have no effect, she did--she had been in the store and she did know the victim in this matter.  And we feel that that may have some [e]ffect.

THE COURT:  I find that that's acceptable articulation.  As to Mr. Dupre?

MR. GOORLEY:  Mr. Dupre was--that was basically a peremptory I was using that we are entitled to occasionally to [use] peremptories for--

THE COURT:  No sir, that is incorrect.

MR. RICHARD:  No.

THE COURT:  Pursuant to [the] <u>Batson</u> case you're not entitled to just a peremptory when there is a pattern of white people, and right now I need an articulable reason.  If you have none, tell me that and we'll go on to determine whether <u>Batson</u> applies.

MR. GOORLEY:  Well, Your Honor, again I would ask that we complete this panel before we make that decision.

THE COURT:  I want you to articulate, Mr. Goorley, if you have a reason.

MR. GOORLEY:  Other than this is just a challenge that--

THE COURT:  Okay.  Ms. Vickie Smith?

MR. GOORLEY:  She indicated--first of all[,] she indicated some time earlier something to do with some strong religious beliefs.  That was the first thing, I believe, that came out of her mouth.

THE COURT:  She did say that she was a devout--devout in her religion.  How does that affect--that's not articulating anything with me.  She went on to say in the answer to number thirteen of the questionnaire that the religious devoutness would have no effect on her decision-making process.  So I find that unacceptable as well.  You have anything else other than that?

MR. GOORLEY:  No, Your Honor.

14

THE COURT:      Okay.  What about on Mr. Chapman?

MR. GOORLEY:   He indicated first that--earlier, even though he was rehabilitated by the Court about some problems with accepting the law as given to him by the Judge and that causes us some concern.  I believe the other people that indicated that along those lines have been excused for other reasons.

THE COURT:       So why does that have a difference if they're excused for other reasons?

MR. GOORLEY:  Well, because they're not susceptible to any sort of challenge because they were excused for cause for other reasons.

THE COURT:      Alright, I'm going to find that I accept that reason for Mr. Chapman.  It would be something that would be a Batson or a reason that's articulable, which would perhaps give concern.  But you can't give me a reason for Mr. Dupre or Ms. Smith, I'm going to deny those peremptories based upon Batson, and I'll note your objection for the record as to my denial of the same.

MR. GOORLEY:  But we do have back strikes and if it proves later on that I'm not excluding people according to Batson--

THE COURT:      Once--well, yes that's fine.  They're there now and then we'll see.  So we're down to two peremptories for you and Mr. Dupre is back on and Ms. Smith is back on.

Once the juror challenges concluded for the first panel, the trial court again

brought up the State's *Batson* objection:

THE COURT:      Mr. Richard, just so we'll all know where we sit because I don't play hide the ball, Mr. Goorley's gone a long way so far to defeating your Batson challenge and when his back strikes come up[,] I'll be looking.

MR. RICHARD:   Well[,] I think that he's already articulated--his failure to articulate sets it up and I think he's got a problem.

THE COURT:      Well, the problem is this that you're going to now have, once he starts keeping whites on the jury then perhaps that's not his pattern.

MR. RICHARD:   No, that's not accurate because it's not as to the pattern, it's once the pattern is established then every person he kicks off for a non-articulable race [neutral,] gender [neutral] reason is suspect, as I understand Batson.

15

THE COURT: Well, you know I was just-- I believe I had a jury selection just last week where someone named Richard took issue with that definition but it's only because it went further--

MR. RICHARD: Yes.

THE COURT: I'm inclined to agree with him, Mr. Goorley, but I'll hear you on that point before we come to a final on Dupre and Smith. I believe that Mr. Richard has stated an accurate representation of Batson as it exists.

After the parties interviewed the second panel of prospective jurors, they again met to consider juror challenges. The district court granted all motions for cause before considering peremptory challenges. The defense attorney voluntarily gave his reason for his first peremptory challenge for the second panel:

MR. GOORLEY: Your Honor, I challenge Ms. [Lecia] Courville--peremptory challenge her for the reasons that she did indicate that[,] at one time[,] she had formed an opinion on this[,] and I believe that[,] at least[,] is sufficient for a challenge--peremptory challenge.

THE COURT: Mr. Richard, I think that's going to make the Batson[,] but I'll hear you on it.

MR. RICHARD: No, I think that he's got himself covered.

The following conversation took place concerning the next juror that Defendant peremptorily challenged:

THE COURT: Mr. Richard, on Mr. [William] Duhon?

MR. RICHARD: He's fine. He came along[,] but he was stewing when you-

THE COURT: He was.

MR. RICHARD: On a real boil, not even a slow boil, a real boil.

THE COURT: I had to do that, I believe. I have to discourage that and so sometimes I'll have to take the hit there as well, but I did it on purpose.

MR. RICHARD: No, but I mean he came along.

THE COURT: He did. Okay, Mr. Goorley?

16

MR. GOORLEY:    Your Honor, I'm going to excuse him because of that.

THE COURT:      You have a continuing <u>Batson</u> that you--

MR. RICHARD:    Oh yeah.

MR. GOORLEY:    In spite of that, he was a little stewing and that causes me some concern about whether he's going to give this case his full attention as opposed to worrying about what else he--unlike the other jurors, everyone's inconvenienced, I know that, but it seems he was a little bit more than inconvenienced.  He looked a little ticked.

THE COURT:      I'm inclined to agree with him, and it's certainly articulable.  While you brought him along a long ways, I don't think he was happy at the end of it and I think it's an articulable reason regardless.  I'm going to accept it.

The defense used its third peremptory challenge for the second panel to

challenge Mr. Malcolm Plonsky:

MR. GOORLEY:    I'm going to use a peremptory on him, Judge, and it's one that's because I think I'm past the <u>Batson</u> point and if I'm past that point I'm allowed to use some peremptories just for gut feeling.

MR. RICHARD:    No, I don't think so.

THE COURT:      I'm not sure that's the case, Mr. Goorley.  There are two white ladies he kept on Panel A, which--

MR. RICHARD:    But it doesn't make it--once there's a pattern you went through, you did knock four off, he couldn't articulate for two, he's established a pattern and I think he's got to articulate it.  I don't think he can--when we're talking about, and let me point out once again although--and let me take the record forward if the Court would allow me.

THE COURT:      Certainly.

MR. RICHARD:    Mr. Williams for the State, excused as a white male.  Ms. Courville is a white female.  Since the record doesn't reflect that he excused a challenge, he gave a--the Court found his reason articulable.  Ms. Guilbeau was excused by the Court, she is a white female[,] but you found a problem there.  He kept Ms. Hebert, who is a white female, and he--I kept--he kept Ms. Gloston, who is a black female.  He excused Mr. Duhon, [who] is a white male.  He has excused Mr. Plonsky now, so I point out that every challenge he has made is to a white male or female.

17

. . . .

THE COURT: I'm going to find that he's past his <u>Batson</u>. You'll have to re-establish at this point.

MR. RICHARD: To which ruling the State objects. I don't think there's [any] such thing as past the <u>Batson</u>.

. . . .

THE COURT: You can repair the error of your ways, Mr. Richard, and what you're telling me is that any time now that he chooses to exercise a peremptory that he's got to articulate because they're white, but my problem with that is that he's allowed whites on the jury.

MR. RICHARD: I understand[,] but that doesn't undo the fact that he challenged four, of which you put back two. I mean if we've got a pattern[,] we got a pattern, and he couldn't articulate two race neutral reasons for two, and so just for the record, Judge, I'm not arguing with you.

THE COURT: I understand that. I'm just trying to figure out where we're going to go with this because you--if you get a not guilty it's academic.

MR. RICHARD: I'm finished. I'm dead meat, but it doesn't make any difference. You rule the way you see fit, but I just take exception to Mr. Goorley's characterization that he can repair once he started and I think once he--

THE COURT: Do you feel you're simply letting go Mr. Plonsky because you want to exercise a peremptory.

MR. GOORLEY: Yes, part of it is he had a prior jury duty and he, I believe, was with a case with Mr. Richard. And part of it is perhaps he's tasted that blood before and maybe--

THE COURT: Give me that <u>Batson</u> case. We're going to take a break--just a little short break here. You can go off for a second.

(GO OFF RECORD MOMENTARILY.)

THE COURT: Based upon a review of <u>Batson</u>[,] I am going to retract my former statement and state that[,] once the pattern's established[,] you've got to articulate every time. I don't find what you've done with Mr. Plonsky is articulable and I'm not going to allow it.

The defense objected to the trial court's ruling before challenges continued.

18

When the State exercised a peremptory challenge to excuse Mr. Spencer Aucoin, a twenty-two year old white male who did not work and lived at home with his parents, the defense stated for the record that Mr. Aucoin would have been acceptable to it. After dismissing the excused jurors, the trial court ordered the remaining potential and selected jurors to return the next day; and then, it adjourned for the day.

The following morning, the district court resumed jury selection by calling a third panel of potential jurors for examination. When the parties conferred for challenges, both the strikes for cause and the initial peremptory strikes went without objection. The State then back struck the other Ms. Smith from the first panel, and Defendant declined to challenge any of the empaneled jurors on backstrike. Both parties agreed to accept the next and final juror before selecting alternate jurors.

Defense counsel peremptorily challenged the first potential juror offered as an alternate, Mr. Rhyney Latiolais:

> MR. GOORLEY: Your Honor, I'd like a peremptory on him based on his answers about the previous jury. It did cause him some despair, which I guess it should have. I guess we didn't really delve into what the actual verdict was but I don't know if it really matters that much one way or the other. Apparently[,] in talking to him, at least I feel that whatever experience he had in that case, which was one that basically affected him, he indicated he carried it with him, may have some [e]ffect on him in this case. Plus[,] he indicated the other case was somewhat similar and I'm concerned about things that may have happened in that other case that may carry over to this case that we don't know about, about certain laws and instructions or things along those lines. And that's why I have reservations about him being on this one.

> THE COURT: Mr. Richard?

> MR. RICHARD: Admirably articulated race and gender neutral explanation.

> THE COURT: Absolutely. The peremptory is granted.

19

The parties accepted the next two potential jurors as alternates without objection.

Louisiana Code of Criminal Procedure Article 795 prohibits the use of peremptory challenges solely based upon the race of the juror. The party objecting to the peremptory challenges must establish a *prima facie* case of discrimination. *Id.* The court may then demand a satisfactory race neutral reason for the peremptory challenge. *Id.* The trial court is required to allow each peremptory challenge for which the record reveals or the challenger discloses a satisfactory race neutral reason for the challenge. *Id.* The court may order those jurors for whom no satisfactory race neutral reason is given to be reinstated to the jury panel. *Id.* Both the prosecution and the defense are prohibited from excluding potential jurors solely on the basis of race. *McCollum*, 112 S.Ct. 2348.

The Supreme Court has explained that the initial burden of proof rests on the party raising the *Batson* objection to make a *prima facie* case of purposeful discrimination. *Batson*, 106 S.Ct. 1712. The objecting party may establish a *prima facie* case of discrimination by showing that the other party has been either totally or seriously and disproportionately excluding one race from the petit jury through use of peremptory challenges. *Purkett*, 115 S.Ct. at 1770; *McCollum*, 505 U.S at 59, 112 S.Ct. at 2359; *Batson*, 476 U.S. at 93-94, 96-97, 106 S.Ct. at 1721-23. Once the trial court is satisfied that the objecting party has successfully established a *prima facie* case of discrimination, the burden of proof then shifts to the other party to provide adequate race neutral reasons for his monochromatic challenges. *Purkett*, 115 S.Ct. 1769; *McCollum*, 112 S.Ct. 2348; *Batson*, 106 S.Ct. at 1712. Finally, the trial court must decide whether there has been purposeful racial discrimination. *Purkett*, 115 S.Ct.1769. The trial court's determination of the presence or absence of discriminatory intent is given great deference by the reviewing courts and will not be

20

reversed absent a showing of clear error. *State v. Tyler*, 97-338 (La. 9/9/98), 723 So.2d 939, *cert. denied*, 526 U.S. 1073, 119 S.Ct. 1472 (1999); *Collier*, 553 So.2d 815.

The *Batson* discussions in the record show that the State indicated that it had a continuing objection to Defendant's challenge of white potential jurors. Thus, Defendant is incorrect in asserting that the trial court raised the *Batson* objections *sua sponte*.

Additionally, the defense is incorrect in asserting that the prosecution failed to meet its burden of establishing discriminatory intent, and Defendant is also incorrect in alleging that the State presented absolutely no evidence concerning the defense's discriminatory intent. The record shows that Defendant is black, and the victim was white. Also, the State twice clearly articulated for the record that Defendant only used his peremptory challenges to challenge white potential jurors, which, as previously stated, is sufficient to establish discriminatory intent. *Batson*, 106 S.Ct. 1712. Therefore, the prosecution clearly established a *prima facie* case of discriminatory intent.

Defendant is also incorrect in contending that he did not bear the burden of proof. Once the prosecution revealed the *prima facie* pattern of discrimination, the burden of proof shifted to the defense. Thus, the trial court did not err in requiring Defendant to articulate an adequate race neutral reason for each challenged potential juror fitting the discriminatory pattern.

Likewise, Defendant is incorrect in claiming that the trial court erred in requiring Defendant to give further explanation after he had stated race neutral reasons for the first two peremptory challenges. He cites *State v. Baker*, 34,973 (La.App. 2 Cir. 9/26/01), 796 So.2d 145, and *State v. Gibbs*, 31,370 (La.App. 2 Cir.

21

2/24/99), 728 So.2d 945, *writ denied*, 99-1075 (La. 9/24/99), 747 So.2d 1118 in support of his claim. First, examination of the record reveals that the trial court found Defendant's race neutral reasons adequate for his first and fourth peremptory challenges, not the first two.

Second, *Baker* does not support Defendant's argument. In *Baker*, the trial court made no explicit finding that the *Batson*-objector had established *prima facie* discrimination. Without so finding, the trial court, did not require the other party to explain its challenges, but it went on to say that race neutral reasons for the peremptory challenges were evident on the record. *Id.* at 153. Defendant does not allege that the trial court should have found adequate race neutral reasons in the record for his challenges.

Third, the *Gibbs* court did not hold that giving adequate race neutral reasons for one or more challenges excused a party from the other's *Batson* objection. Instead, *Gibbs* objected solely to the trial court's exclusion of one juror without requiring the State to articulate an adequate race neutral reason. The trial court, in *Gibbs*, specifically found that there were adequate race neutral reasons in the record for the peremptory challenge of that juror; there was no such finding for the challenges Defendant made in the instant case. Again, Defendant does not allege that the trial court should have found adequate race neutral reasons in the record for his challenges.

Moreover, as demonstrated by the facts in *Elie*, 936 So.2d 791, the party defending its peremptory challenges can be required to state an adequate race neutral reason for all of the challenges fitting the discriminatory pattern, even after it has given adequate race neutral reasons for some of them. Therefore, the trial court did not err in requiring Defendant to provide an adequate race neutral reason for each

22

potential juror he challenged who fit the pattern of discrimination established by the State. Accordingly, Defendant's *Batson* arguments are without merit.

Defendant also contends that the trial court erred in dismissing Juror Norma Lewis after trial started. Defendant explains that Juror Lewis realized on the second day of trial that she knew Defendant's aunt and uncle. Although the trial court initially declined to remove either Juror Lewis or a fellow juror with whom she had shared her realization, the district court later replaced her with an alternate juror after the State again moved for Juror Lewis' removal from the case. The trial court removed Juror Lewis even though she stated that she could be fair and impartial. Defendant argues that the trial court erred in concluding that this late-realization had deprived the State of a challenge.

Defendant asserts that the discharge of Juror Lewis constituted reversible error, i.e., once seated, a juror can only be dismissed for inability to serve, and that the removal of the juror was reversible error because harmless error is inapplicable where the burden of proof is higher than the party's preference.

The State replies that this is also without merit according to La.Code Crim.P. art. 789 and *State v. Fuller*, 454 So.2d 119 (La.1984). The prosecution observes that the juror admitted that she had violated the trial court's order by speaking to Defendant's aunt about the case. Additionally, the juror also spoke to another juror about her discovery that she knew Defendant. The juror also said that she felt odd and uncomfortable about being involved in the case.

The record shows that the second day of trial commenced with the questioning of Juror Lewis after she had approached the bailiff and told him that she had realized the previous afternoon that she knew Defendant's aunt and uncle very well. Juror Lewis had revealed this information to another juror who reported that Juror Lewis

23

had expressed that she would feel awkward in rendering a verdict because of the acquaintance.

When questioned, Juror Lewis revealed that she was "real friends" with Defendant's uncle and aunt. She further revealed that, "And I just found out because someone said, 'Well[,] I think that's his son.[']  I said, 'Oh no, I know his son--his sons. That's not his son.' And his aunt said, 'That's my nephew.'" Juror Lewis was disturbed enough that she did not sleep during the night after her discovery, because she did not like to be involved in a trial concerning someone close to her. When asked if the relationship would affect her ability to serve as a juror, she stated that she could serve, but she would not like it, and she would be uncomfortable doing so.

Juror Lewis then revealed that she had previously sat on the jury in a trial where an acquaintance had been negatively affected by the verdict. Afterward, the acquaintance had talked about her "like everything." Juror Lewis restated and then reiterated that she would make the right decision, and not let her emotions play a part in that decision, but she would be uncomfortable.

After the interview, the trial court held:

> THE COURT: Okay, then I'm going to let you go [back to the jury room]. I'm going to tell you right now [that] I'm going to make a finding that I'm going to leave her on the jury unless I hear a motion from somebody to take her off, and I'm still going to leave her on because I'm telling you that I think that she qualifies just as much as she did before. I appreciate your honest and your candor. I'm going to ask you to do one thing for me, don't say a word to anybody else. It's none of their business. And I'm going to call upon you to do your civic duty as I know you can and render a decision based on the evidence.

The district court then interviewed the juror with whom Juror Lewis had spoken, Christina Soileau. After Juror Soileau promised to keep the information quiet and to not let it sway her decision, the trial court found that Juror Soileau was also qualified to continue serving.

24

Around lunchtime on the same day, the prosecutor reopened the discussion about Juror Lewis. The State informed the district court that there was evidence that Juror Lewis had violated the court's order by discussing the case with someone after she was selected; and by doing so, she discovered her connection to Defendant. On this basis, the State requested that the trial court remove Juror Lewis for cause. The trial court had specifically ordered the jurors not to speak to anyone, including the other jurors, about the case, so the State argued that Juror Lewis had actually violated the court's order twice. The trial court then postponed argument concerning whether Juror Lewis violated sequestration, and whether that was sufficient cause to remove her from the jury, until later in the day.

At the end of the day, the district court resumed the discussion concerning Juror Lewis. The district court entertained argument about whether Juror Lewis should be dismissed for misconduct by discussing the case with Defendant's relatives as well as a fellow juror. The trial court then determined that it needed to interview all of the jurors based on the *Fuller* case.

Other than Juror Lewis and Juror Soileau, the jurors denied knowing of any juror who violated court orders by speaking to another person about the case. When Juror Soileau was called, she reiterated that Juror Lewis had spoken to her about the case in violation of the court's order. Juror Lewis had stated that she knew one of Defendant's relatives. Juror Soileau further stated that Juror Lewis had revealed that she had been given the information by someone she knew sitting in the audience. Juror Soileau testified that the information did not affect her ability to serve as a juror. Juror Soileau was then released from questioning after she averred that she had refrained from sharing the information with any of the other jurors.

25

When the district court called Juror Lewis, she stated that she had overheard Defendant's aunt say that Defendant was her nephew. Juror Lewis admitted to speaking with Defendant's aunt, but she denied discussing the case during that conversation. Juror Lewis then averred that, other than Juror Soileau, she had spoken to no one concerning her revelation. Juror Lewis reiterated that she felt awkward, uncomfortable, and did not like serving on Defendant's jury. Juror Lewis did not feel that she had violated the court's order by speaking with Juror Soileau because she did not talk about Defendant or the case. Juror Lewis revealed that she had told Juror Soileau that she needed to speak to the court about the information and that she felt "funny" about being on the case.

The trial court observed that neither the State nor the defense had been given the information about Juror Lewis's close relationship with Defendant's relatives during *voir dire*. The district court found that to be compounded by Juror Lewis speaking to another juror about the matter. The trial court then replaced Juror Lewis under La.Code Crim.P. art. 789 instead of declaring a mistrial. The district court specifically found replacement to be the best option.

Under La.Code Crim.P. art. 789, the purpose of having alternate jurors is to replace jurors who become unable to perform to fulfill their duties or become disqualified. As a first degree murder case, which is a capital offense, the jurors were automatically sequestered. La.Code Crim.P. art. 791; *see also State v. Goodley*, 398 So.2d 1068 (La.1981) (first degree murder is a capital offense even if the State does not seek the death penalty). Sequestration requires that he jurors be kept together in the charge of an officer of the court so as to be secluded from outside communication, except for absentee voting. La.Code Crim.P. art. 791.

26

The cases cited by Defendant do not support his argument that the trial court's dismissal of Juror Lewis constituted reversible error. In *Fuller*, 454 So.2d at 122-23, the supreme court addressed whether a juror could be disqualified based on violation of sequestration orders:

> The jurors were sequestered throughout the trial. During the evening of the next to last day of trial, after all evidence had been presented, one of the jurors disregarded the judge's sequestration order and apparently went to a bar in the motel where the jurors were staying. He had been there for about an hour when the bailiff discovered him and returned him to his room.

> The next morning the judge conducted a hearing and conscientiously examined that juror and the other jurors to determine the extent of the transgression. The juror claimed that the only person with whom he conversed was the barmaid. The other jurors testified that they had not discussed the case with anyone.

> Although the juror denied discussing the case or the fact that he was a juror with the barmaid, there is no doubt that the juror willfully disobeyed the sequestration order and was not "secluded from outside communication." Confronted with this situation in a capital case (where sequestration is mandatory), the judge chose to replace the transgressing juror with an alternate. Defense counsel objected to this action and moved for a mistrial based on the juror's misconduct.

> The trial judge was called upon to decide whether the juror had become disqualified to perform his duties and, if so, what action to take. La.C.Cr.P. Art. 789. The judge acted properly in holding an evidentiary hearing, with all parties present, to determine the existence of a violation of his order, the nature and extent of the violation, and the appropriate solution to the problem.

> The juror assured the judge that he did not, while in the bar, compromise his position by discussing the case or his status as a juror. Although a judge under some circumstances may have been satisfied that such a showing overcame the presumption of prejudice flowing from a sequestration violation, the judge in this instance determined that the essential fairness of the proceeding could best be preserved by replacing the juror with the properly qualified and duly selected alternate. Moreover, the judge's decision to replace the juror, rather than to declare a mistrial, was largely justified by the facts that the violation had occurred during the evening recess and that the other jurors had denied that they were exposed to any outside influence possibly resulting from the violation.

The trial court has discretion to utilize the service of an alternate juror, rather than to grant a mistrial, upon a proper finding that this is the best course of action. Thus, when it was shown that a juror was unable to continue to serve because of the physical disability that was involved in *State v. Spencer*, 446 So.2d 1197 (La.1984), or was "disqualified" from further service because of the blatant display of prejudices and partiality that was involved in *State v. Marshall*, 410 So.2d 1116 (La.1982), the replacement of the juror with the alternate has been approved by this court.

The trial judge in this case acted in a fair and deliberative manner when he decided that the juror's willful violation of the order by going to the motel bar was a sufficient ground to disqualify him from further service. The judge also considered alternative courses of action. Replacing the juror with the alternate under the overall circumstances was a proper exercise of the trial judge's discretion.

In *State v. Derouselle*, 97-2590, (La.App. 4 Cir. 8/30/00), 769 So.2d 141, *writ denied*, 00-2750 (La. 10/12/01), 799 So.2d 491, the fourth circuit, on remand from the supreme court, concluded that the trial court properly replaced a juror under La.Code Crim.P. art.789 after discovering that the juror had failed to disclose that her husband was on parole for an aggravated rape conviction, even though the failure to disclose resulted from a misunderstanding of a *voir dire* question. The State had used peremptory challenges to excuse other potential jurors who were related to people convicted of crimes. The trial court found that her failure to disclose a potential source of bias raised doubts about the juror's candor and her ability to serve impartially. The fourth circuit found that the district court properly exercised its discretion in dismissing her even though she had testified that her husband's conviction and parole revocation would not affect her ability to remain impartial.

Even though the jurors in Defendant's case were not sequestered to the same extent as those in the *Fuller* case, the trial court had ordered the jurors not to discuss the case with anyone, including other jurors. Although Juror Lewis stated in her second interview that she had not discussed the case with Defendant's aunt or anyone else, she had testified in her first interview that: "And I just found out because

28

someone said, 'Well[,] I think that's his son.['] I said, 'Oh no, I know his son--his sons. That's not his son.' And his aunt said, 'That's my nephew.'" This reveals that Juror Lewis participated in an, at least, three-party discussion about Defendant's relationship to his aunt and uncle. Juror Lewis did not deny telling Juror Soileau about the information or her reservations about sitting on the jury as a result. Furthermore, Juror Lewis repeatedly conditioned her assurances of impartiality by expressing her discomfort and dislike for serving on the jury under the circumstances.

We find that, under La.Code Crim.P. art. 789, *Fuller*, and *Derouselle*, the trial court did not abuse its discretion in disqualifying and replacing Juror Lewis with a qualified alternate juror. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant asserts that "[t]he State was not entitled to reversal of the trial court's order for new trial where the decision was not appealable by the State, and the court of appeal could not provide the State with appellate rights contrary to Article 912 of the Code."

The State responds that La.Code Crim.P. art. 912 is a non-exclusive list of preliminary rulings and that Comment (c) indicates that a grant of a motion for new trial would be appealable because such rulings end the case, taking the proceedings back to "square one." The State further contends that La.Code Crim.P. art. 858 clearly indicates that appellate and supervisory jurisdiction for either the refusal or the grant of a new trial can be invoked for error of law.

The State sought supervisory review of the district court's ruling; it did not appeal. Defendant admits that the State sought supervisory review of the trial court's grant of his motion for new trial. Review of the case file for *State v. Singleton*, an unpublished opinion bearing docket number 05-922 (La.App. 11/2/05), *writ denied*,

29

05-2485 (La. 3/24/06), 925 So.2d 1225, also shows that the State did not "appeal;" instead, it sought review by filing a supervisory writ. Defendant limits his assignment of error strictly to the right to seek review through appeal and ignores any argument concerning the State's right to seek supervisory review. Accordingly, this assignment of error is not germane to Defendant's case.

## CONCLUSION

Defendant's conviction is affirmed. However, in accordance with La.Code Crim.P. art. 930.8, this court instructs the trial court both to inform Defendant of the time delays for seeking post-conviction relief by sending written notice to Defendant within thirty days of the rendition of this opinion and to file written proof in record showing that Defendant received the notice.

**CONVICTION AFFIRMED; REMANDED WITH INSTRUCTIONS**.